IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CRM COLLATERAL II, INC.,

        Plaintiff,

                                        CV 08-1266-PK

                                        OPINION AND
v.                                       ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

        Defendant.

_____

PAPAK, Magistrate Judge:

        Plaintiff CRM Collateral II, Inc. ("CRM"), and Richard Altorfer filed this action against

Tri-County Metropolitan Transportation District of Oregon ("TriMet") and KeyBank National

Association ("KeyBank") on October 27, 2008.  On November 4, 2008, Altorfer was voluntarily

dismissed as a plaintiff.  On November 10, 2008, TriMet filed a counterclaim for declaratory

Page 1 - OPINION AND ORDER

relief.  CRM voluntarily dismissed KeyBank as a party to the action on January 20, 2009.

Now before the court are CRM's motion (#37) for partial summary judgment and TriMet's motion (#49) for summary judgment.  I have considered the motions, oral argument on behalf of the parties, and all of the pleadings on file.  For the following reasons, both motions are denied.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  The substantive law governing a claim or defense determines whether a fact is material.  *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence.  *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other.  *See* Fed. R. Civ. P. 56; *see also*, *e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  A court may not

grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## FACTUAL BACKGROUND

In November 2005, defendant TriMet entered into Contract No. RH030433LE (the "Contract") with third party Colorado Railcar Manufacturing, LLC ("Colorado Railcar"), pursuant to which Colorado Railcar would manufacture and TriMet would purchase three railcars and one trailer for TriMet's use in connection with its Westside Express Service ("WES") between Beaverton, OR, and Wilsonville, OR.  TriMet's price for the railcars and trailers was initially fixed at $17,821,806, but was subsequently reduced, first to $17,481,135 and later to $17,299,135.  The Contract required Colorado Railcar to maintain an irrevocable standby letter of credit in the amount of $3 million continuously from the time it issued notification that manufacture would begin to the final delivery of railcars and trailers to TriMet.

Plaintiff CRM was incorporated November 13, 2006, for the purpose, among other potential legal purposes, of fulfilling Colorado Railcar's letter of credit obligation under the Contract.  Colorado Railcar's CEO, Thomas Rader, is one of CRM's two corporate directors, and Colorado Railcar's CFO, John Thompson, was CRM's registered agent at the time CRm was incorporated.  CRM's second corporate director and its sole corporate officer (both its President and its Treasurer) is Scott State, who worked with Colorado Railcar as a consultant from 2004 through 2007.

On November 17, 2006, Colorado Railcar and CRM, along with certain investors including former plaintiff Altorfer, entered into an Investment Agreement whereby Colorado Railcar agreed to pay CRM and the investors to maintain a letter of credit in satisfaction of

Page 3 - OPINION AND ORDER

Colorado Railcar's obligation to do so under the Contract. That same day, CRM obtained Irrevocable Standby Letter of Credit No. 312084 (the "Letter of Credit") from KeyBank National Association. The Letter of Credit identified CRM as the "applicant" and TriMet as the "beneficiary." The terms of the Letter of Credit required TriMet to certify in writing that CRM was in default under the Contract in order to draw on the letter as its beneficiary. As originally issued, the expiration date of the Letter of Credit was November 15, 2007.

In April 2007, TriMet learned for the first time that CRM was the applicant on the Letter of Credit. Effective April 20, 2007, TriMet, Colorado Railcar, and CRM agreed to a written modification of the Contract (Modification No. 1), pursuant to which CRM became a party to the Contract for the sole purpose of making a default by Colorado Railcar under the Contract constitute a default by CRM for purposes of the Letter of Credit. Rader represented CRM in the negotiation of Modification No. 1, and State signed Modification No. 1 on CRM's behalf. In addition, in connection with Modification No. 1 CRM supplied to TriMet certain organizational resolutions issued by CRM's board of directors providing that only officers of the corporation – namely, State and no other person – were authorized to enter into agreements on CRM's behalf.

In October 2007, the parties agreed to extend the Letter of Credit's expiration date from November 15, 2007, to May 15, 2008. Rader and Thompson participated in the extension negotiations, and State did not, although State ultimately signed the amendment that effected the extension.

On January 16, 2008, TriMet and Colorado Railcar entered into a Project Monitoring Agreement (the "PMA") that modified their rights and obligations under the Contract. CRM was not a party to the PMA, nor was CRM directly advised that the PMA had been executed – that is,

State was not advised, although Rader was necessarily aware of the PMA in consequence of his status as Colorado Railcar's CEO. The PMA modified the relationship between Colorado Railcar and TriMet, in relevant part, as follows: under the PMA, TriMet would make "special contract payments" to or on behalf of Colorado Railcar, including payments not provided for under the Contract; TriMet was authorized to fund these special payments by drawing on the Letter of Credit; such special payments, if neither earned under the Contract nor repaid by Colorado Railcar, would become "damages" under the Contract; and TriMet was authorized to compensate itself for such special payments that Colorado Railcar failed to repay by drawing on the Letter of Credit. In addition, under the PMA a "financial monitor" was appointed to oversee Colorado Railcar's operations, and TriMet was given authority to approve or disapprove of Colorado Railcar's budgets and expenditures.

The PMA was modified on February 21, 2008, primarily to add Alaska Railroad Corporation as an additional party. CRM was not a party to the amended PMA, nor was the amended PMA disclosed directly to CRM.

In April 2008, the parties agreed to a second extension of the expiration date of the letter of Credit, from May 15, 2008, to November 15, 2008. Rader and Thompson were involved in the negotiation of the extension and State was not, although he signed the amendment that effected the extension. No party informed State of the existence of the PMA or amended PMA prior to CRM's consent to the extension.

In June 2008, Thompson advised State of the existence of the amended PMA, which he characterized as an agreement that he had not been "involved with." Deposition of Scott State ("State Dep.") at 153:11. State requested that Thompson send him a copy of the amended PMA,

Page 5 - OPINION AND ORDER

and Thompson did so.  State Dep. at 153:13-19.  State read the amended PMA and understood, at

a minimum, that it "purported to give TriMet the right to call on the [L]etter of [C]redit to

compensate [itself] for special contract payments under the PMA."  State Dep. at 157:17-19.

State did not contact TriMet to discuss the amended PMA or its impact on CRM's obligations

under the Letter of Credit at that time, but rather discussed the matter with KeyBank and hired an

attorney to represent him and/or CRM.  State Dep. at 157:20 - 158:10.

   In or around September or October 2008, Colorado Railcar completed the manufacture

and delivery of the railcars and trailer, and shortly thereafter ceased operations.  Prior to the

completion date, TriMet made more than $5.5 million in special contract payments to Colorado

Railcar under the auspices of the PMA and amended PMA.

   On October 22, 2008, TriMet attempted to draw on the Letter of Credit to reimburse itself

for $3 million of those special contract payments.  In response, a group of investors in CRM filed

an action in the state court for Clayton County, Iowa, and on November 5, 2008, filed a motion to

enjoin KeyBank from honoring the draw request.  KeyBank did not oppose the motion, which

was granted on November 7, 2008.  On November 12, 2008, KeyBank removed the action to the

federal Northern District of Iowa, and on November 14, 2008, TriMet moved to intervene on an

expedited basis, simultaneously filing a motion to dissolve the injunction against KeyBank.  On

December 4, 2008, Judge McManus of the Northern District of Iowa granted TriMet's motion to

intervene.  CRM likewise moved to intervene on January 22, 2009, and its motion was granted

on February 25, 2009.  To date, the court for the Northern District of Iowa has not acted on

TriMet's motion to dissolve the injunction.

## ANALYSIS

The parties' dispute centers around TriMet's attempt to draw on the Letter of Credit in October 2008.  Specifically, CRM alleges TriMet's liability for fraud in connection with the April 2008 extension of the Letter of Credit's deadline from May 15, 2008, to November 15, 2008, chiefly for failing to disclose the existence of the PMA and/or amended PMA before obtaining CRM's consent to the extension.  In addition, CRM seeks declaratory judgment that the Letter of Credit and all amendments thereto are null, void, and unenforceable, that the Letter of Credit has expired, that TriMet may not draw on the Letter of Credit, and that any draw request on the Letter of Credit shall be without effect.  Finally, CRM requests rescission of the Letter of Credit and all amendments thereto.  In connection with its counterclaim, TriMet seeks this court's declaration that the Letter of Credit, as amended, is valid and enforceable, that TriMet's draw request of October 22, 2008, complied with the terms of the Letter of Credit, that CRM is in default under the Contract, and that TriMet is "entitled" to draw $3 million on the Letter of Credit.

CRM moves for partial summary judgment as to TriMet's counterclaim and as to its own claim for declaratory relief only, whereas TriMet moves for summary judgment as to its own counterclaim and as to all of CRM's claims against it.  Where, as here, the court's jurisdiction is premised on the diversity of the parties' citizenship, the parties' motions will be decided under the substantive law of court's forum state, here Oregon.  *See*, *e.g.*, *Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

## I.    Fraud

As noted above, CRM alleges TriMet's liability for fraud in connection with the April 2008 extension of the Letter of Credit's deadline from May 15, 2008, to November 15, 2008.

Specifically, CRM argues that TriMet committed fraud in the course of negotiating the extension by failing to disclose to CRM the existence of the PMA and by failing to disclose that, at that time, it had already obtained Colorado Railcar's stipulation that it was in default under the Contract.

The elements of a claim for fraud under Oregon law are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Webb v. Clark*, 274 Or. 387, 391 (1976); *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89 (1995).[1]  In regard to the ninth enumerated element, damages caused by the fraud, the focus "is on whether the plaintiff's reasonable reliance on the defendant's false representation caused harm to the plaintiff." *Westerberg v. Mader*, 182 Or. App. 150, 155 (2002).

"Fraud must be proved by clear and convincing evidence. Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Coy v. Starling*, 53 Or. App. 76, 80 (Or. Ct. App. 1981), *citing*, *e.g.*, *Krause v. Eugene Dodge, Inc.*, 265 Or. 486, 502 (1973).  "If any one of the[] elements [of a cause of action for fraud] is not established by clear and convincing evidence, [the fraud] plaintiff's case must fail." *Id.*, *quoting Webb v. Clark*, 274 Or. 387, 391 (1976).

For the following reasons, TriMet has not met its burden at summary judgment to

---

[1]  Some Oregon courts consolidate the nine elements of a claim for fraud down to a list of five, but the same essential requirements are present whether enumerated as five or nine elements.

establish that there is no genuine issue as to any material fact as to CRM's fraud claim and that it is entitled to a judgment as a matter of law.  In consequence, TriMet's motion is denied to the extent TriMet seeks summary judgment as to CRM's claim for fraud.

### A.    Material, False Representation

It is undisputed that TriMet did not at any material time disclose or attempt to disclose either the PMA or Colorado Railcar's stipulation of default to CRM's principal, State. However, it is also undisputed that Thompson and Rader participated in the negotiations regarding the extension of the Letter of Credit's expiration date.  Under Oregon law, "[a]n agent's knowledge acquired within the scope of the agency is imputed to the principal, regardless of whether the agent actually communicates that knowledge to the principal." *Benson v. State*, 196 Or. App. 211, 217 (2004), *citing Hogan v. Alum. Lock Shingle Corp*, 214 Or. 218, 228 (1958).  There are therefore questions of fact both as to whether Thompson and Rader were acting as CRM's agents in the course of the extension negotiations, or only as Colorado Railcar's representatives, and, if they were, as to whether the PMA and/or stipulation of default were raised during the negotiations, so that Thompson and Rader could be said to have "acquired" knowledge[2] of either while acting within the scope of their agency.  There is therefore necessarily a question of fact as to whether TriMet failed to disclose the PMA or Colorado Railcar's stipulation of default at the time it negotiated the extension of the Letter of Credit.

Under Oregon law, "[i]t  is well settled that the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation." *Heise v. Pilot*

---

[2]  Whether agency principles permit Rader's undisputed *prior* knowledge of the PMA and of Colorado Railcar's stipulation of default to CRM is discussed *infra*.

*Rock Lumber Co.*, 222 Or. 78, 86 (1960) (citation omitted); *see also*, *e.g.*, *Ogan v. Ellison*, 297 Or. 25, 34 (1984) ("Actionable fraud may be committed by a concealment of material facts as well as by affirmative and positive misrepresentations"), *quoting Musgrave v. Lucas*, 193 Or. 401, 410 (1951); *Whitlatch v. Bertagnolli*, 45 Or. App. 985, 989 (1980) ("affirmative statements need not be made in order to be liable for fraud.  Silence or concealment of facts can be the basis for a fraud action").  However, as a general rule, "[f]or non-disclosure to form the basis of a fraud claim, [the] defendant must be under a duty to disclose."  *Gebrayel v. Transamerica Title Ins. Co.*, 132 Or. App. 271, 281 (1995), *citing U.S. National Bank v. Fought*, 291 Or. 201 (1981).

As TriMet correctly notes, the Oregon courts recognize three classes of circumstances[3] under which nondisclosure may be actionable as fraud in the absence of any affirmative duty to disclose.  First, the Oregon courts have found actionable fraud under circumstances where the parties were in a fiduciary relationship at the time the failure to disclose took place.  *See Gardner v. First Escrow Corp.*, 72 Or. App. 715, 720 (1985) ("Fraud may be predicated on a failure to disclose material facts when the parties have a fiduciary relationship").  Second, the Oregon courts have held that "nondisclosure of material facts can be a form of misrepresentation where the defendant has made representations which would be misleading without full disclosure." *Elizaga v. Kaiser Foundation Hospitals, Inc.*, 259 Or. 542, 547 (1971).  Third, numerous Oregon courts have found actionable fraud without express reference to a duty to disclose, citing instead circumstances in which a reasonable person would expect full disclosure of facts.  *See*, *e.g.*,

---

[3]  In addition, fraud may be predicated on active concealment of material fact, in which case neither an affirmative misrepresentation nor a duty to disclose is required for the fraud to be actionable.  *See*, *e.g.*, *Paul v. Kelley*, 42 Or. App. 61, 66 (1979); *Gebrayel*, 132 Or. App. at 282. Here, however, the record contains no evidence to suggest that TriMet actively concealed the existence of the PMA or of Colorado Railcar's stipulation of default.

*Millikin v. Green*, 283 Or. 283, 285-286 (1978) (where a fact is material to a proposed transaction, failure to disclose it constitutes actionable fraud).

CRM does not argue that it was at any material time in a fiduciary relationship with TriMet, and the evidence in the record does not support any such conclusion.  It is similarly undisputed that TriMet made no affirmative representations to CRM that would have been misleading in the absence of full disclosure.  However, CRM argues that TriMet's failures to disclose constituted actionable misrepresentations because, as in *Millikin*, *supra*, the facts not disclosed were objectively material to the decision whether or not to enter into TriMet's proposed transaction.

"A misrepresentation is material where it would be likely to affect the conduct of a reasonable man with reference to a transaction with another person."  *Millikin*, 283 Or. at 286, *citing Heverly v. Kirkendall*, 257 Or. 232, 237 (1970).  It is clear that knowledge of the PMA would have been likely to affect a reasonable applicant's decision whether to consent to extension of the Letter of Credit.  A reasonable applicant could have concluded from analysis of the PMA that it was the intention of the parties thereto for Colorado Railcar to exhaust its assets in the course of completing its obligations to TriMet, with TriMet paying whatever necessary expenses Colorado Railcar's assets were insufficient to cover until such time as the railcars and trailer were delivered, and enjoying right of recourse to the Letter of Credit to reimburse up to $3 million in such expenses.  On that basis, a reasonable applicant could have concluded that refusing the extension and permitting TriMet to declare immediate default under the Contract and draw on the Letter of Credit might have presented a preferable scenario, with better prospects for reimbursement from Colorado Railcar, than would delaying TriMet's draw until after Colorado

Railcar was overwhelmingly likely to be without any assets remaining with which to reimburse the applicant for its loss.

Similarly, there is a question of fact whether knowledge of Colorado Railcar's stipulation of default would have been likely to affect a reasonable applicant's decisionmaking. The materiality of such knowledge would depend on facts not now in evidence, including the extent of Colorado Railcar's default as of the date the extension was negotiated and the resources Colorado Railcar would have had available to reimburse the applicant had default been declared at that time.

### B.    TriMet's Knowledge

It is undisputed that, at the time it engaged CRM in negotiating the April 2008 extension of the Letter of Credit's deadline, TriMet was aware of the existence of the PMA and all amendments thereto, and of Colorado Railcar's stipulation of default.

### C.    TriMet's Intent

There is no question but that TriMet intended to obtain CRM's consent to the extension of the Letter of Credit's expiration date. However, that undisputed fact does not imply that TriMet intended to obtain CRM's consent *in consequence of* its ignorance of the PMA or of Colorado Railcar's stipulation of default. Indeed, facts in the record arguably suggest the contrary: TriMet negotiated the extension with Rader, one of CRM's two corporate directors, whom it knew to be necessarily apprised of both the PMA and Colorado Railcar's stipulation. This is consistent with the theory that TriMet intended to negotiate in good faith without concealment of material facts.

Nevertheless, I cannot conclude on the basis of the evidentiary record now before the court that no reasonable trier of fact could find that TriMet intended to obtain CRM's consent by

Page 12 - OPINION AND ORDER

failing to disclose material facts.  TriMet elected to negotiate the extension with Thompson and Rader, whose loyalties were necessarily divided between Colorado Railcar and CRM, despite its actual knowledge both that only State was authorized to act on CRM's behalf[4] and that Colorado Railcar's interests were necessarily adverse, at least in part, to CRM's.  This fact is consistent with CRM's theory that TriMet intentionally avoided disclosure to State, the only person with authority to bind CRM and a person who could not be counted on to place Colorado Railcar's interests above those of the CRM investors.

It is a "rare case in which the record demonstrates evidence of intent that is unequivocal enough to warrant summary judgment;" in general, questions of intent are matters for a trier of fact to determine.  *Nike, Inc. v. Northwestern Pac. Indem. Co.*, 166 Or. App. 312, 330 (2000).  Because the evidence in the record does not rule out the possibility that TriMet intended to defraud CRM by failing to disclose facts material to the decision whether to extend the Letter of Credit's expiration date, this action does not present an exception to that general rule.

**D.    Justifiable Reliance**

It is undisputed that, at the time he consented to the extension of the Letter of Credit's expiration date to November 15, 2008, State was unaware of either the PMA or Colorado Railcar's stipulation of default.  However, as noted above, it is also undisputed that Rader, who was at the time necessarily aware of both the PMA and the stipulation of default, participated in the extension negotiations.  Oregon law provides that "[a]n agent's knowledge acquired within the scope of the agency is imputed to the principal, regardless of whether the agent actually

---

[4]  During the course of the negotiations of Modification 1 to the Contract, TriMet went to considerable lengths to acquire information regarding CRM's corporate structure, and to secure State's signature to bind CRM as a party to the Contract for Letter of Credit purposes.

communicates that knowledge to the principal." *Benson*, 196 Or. App. at 217. Because the evidentiary record leaves open questions of fact both as to whether Rader was acting as CRM's agent during the negotiations with TriMet, and as to whether the PMA and/or stipulation of default were raised during the negotiations, there is necessarily a question of fact as to whether Rader's knowledge may be imputed to CRM for purposes of the justifiable reliance analysis.

State has declared under oath that he would not have agreed to the extension if he had been aware of the amended PMA, creating, at a minimum, a question of fact as to whether CRM actually relied on TriMet's nondisclosure. TriMet does not appear to dispute CRM's right to rely on TriMet's silence, and the facts in the record regarding the relationship among the various parties support CRM's contention that had such a right to rely. There is therefore a question of fact as to whether CRM's reliance on TriMet's nondisclosure was justified.

### E.      Consequent and Proximate Injury

Neither party addresses the "consequent and proximate injury" element of a claim for fraud under Oregon law. However, it is clear that, but for CRM's consent to the extension, the circumstances of TriMet's attempt to draw on the Letter of Credit would be different from the circumstances that now obtain. Because it is possible that CRM would have been better off had TriMet declared default under the Contract as of May 15, 2008, there is a question of fact as to whether it has been damaged in consequence of TriMet's nondisclosures.

## II.    Rescission

CRM's request for rescission of the Letter of Credit stands or falls with its claim for

fraud.[5]  That is, CRM's right to rescission, as alleged, is predicated on the theory that the amendment that extended the Letter of Credit's expiration date was obtained by fraud.  It is clear that, under Oregon law, rescission is an appropriate remedy where a plaintiff's agreement to a contract was fraudulently obtained.  *See*, *e.g.*, *Venture Props. v. Parker*, 223 Or. App. 321, 327 (2008), *citing Bridgmon v. Walker*, 218 Or. 130, 134 (1959).  Because there is a question of fact as to whether CRM may prevail on its fraud claim, there is necessarily also a question of fact sufficient to defeat TriMet's motion for summary judgment as to CRM's claim for rescission.

## III.    Declaratory Relief

As noted above, CRM requests this court's declaratory judgment that the Letter of Credit and all amendments thereto are null, void, and unenforceable, that the Letter of Credit has expired, that TriMet may not draw on the Letter of Credit, and that any draw request on the Letter of Credit shall be without effect, while TriMet seeks declarations that the Letter of Credit, as amended, is valid and enforceable, that its draw request of October 22, 2008, complied with the terms of the Letter of Credit, that CRM is in default under the Contract, and that TriMet is entitled to draw $3 million on the Letter of Credit.  The federal courts are authorized to issue declaratory judgments as to the "rights and other legal relations" of parties to any "case of actual controversy" within the courts' jurisdiction.  28 U.S.C. § 2201(a).  That is, the court may issue a declaratory judgment where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

---

[5]  To the extent CRM's complaint may be construed as stating a claim for rescission of the Letter of Credit premised on the application of suretyship defenses, such a claim necessarily fails as a matter of law.  As discussed in greater detail below, discharge of CRM's obligations as surety would impact neither the validity of the Letter of Credit nor TriMet's right to draw on it.

judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Here, the

parties' dispute over TriMet's entitlement to draw on the Letter of Credit clearly constitutes a real

and immediate controversy between adverse parties.

      In addition to the ripeness inquiry, courts must determine whether, in the courts'

discretion, the parties' dispute warrants the exercise of jurisdiction. *See, e.g., American States

Ins. Co. v. Kearns*, 15 F.3d 142, 143-144 (9th Cir. 1994). The United States Supreme Court has

stated that factors that may be considered in connection with the discretion inquiry include the

following: "[t]he district court should avoid needless determination of state law issues; it should

discourage litigants from filing declaratory actions as a means of forum shopping; and it should

avoid duplicative litigation." *Government Emples. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th

Cir. 1998) (footnote omitted), *citing Continental Casualty Co. v. Robsac Indus.*, 947 F.2d 1367,

1371 (9th Cir. 1991). In addition, the Ninth Circuit has noted further potentially relevant factors,

including:

> whether the declaratory action will settle all aspects of the controversy; whether
> the declaratory action will serve a useful purpose in clarifying the legal relations at
> issue; whether the declaratory action is being sought merely for the purposes of
> procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a
> declaratory action will result in entanglement between the federal and state court
> systems. In addition, the district court might also consider the convenience of the
> parties, and the availability and relative convenience of other remedies.

*Kearns*, 15 F.3d at 145. Here, these factors mitigate in favor of the exercise of jurisdiction. In

consequence, I turn to the parties' respective claims for declaratory relief.

      A letter of credit is an instrument by which a bank (the issuer) agrees to make a payment

to or to the order of a person (the beneficiary) on terms or conditions specified by a customer of

the bank (the applicant). The historical *raison d'être* of the letter of credit was to provide the

Page 16 - OPINION AND ORDER

parties to transactions of significant value with reasonable certainty that an undertaking to pay

would be honored, regardless of the creditworthiness of the payor.  In keeping with that rationale,

Oregon's codification of the Uniform Commercial Code provides that "[r]ights and obligations of

an issuer to a beneficiary or a nominated person under a letter of credit are independent of the

existence, performance or nonperformance of a contract or arrangement out of which the letter of

credit arises or which underlies it, including contracts or arrangements between the issuer and the

applicant and between the applicant and the beneficiary." O.R.S. 74.1030(4).  This so-called

"independence principle" may not be modified or varied by agreement among the parties to a

letter of credit.  *See* O.R.S. 75.1030(3).  Thus, issuers of letters of credit must honor facially

proper draws on letters of credit by beneficiaries, without regard to the rights or obligations

obtaining between the applicant and the beneficiary of the letter of credit.  *See*, *e.g.*, *Western Sur.*

*Co. v. Bank of S. Or.*, 257 F.3d 933, 936 (9th Cir. 2001) (applying Oregon law), *citing Andy*

*Marine, Inc. v. Zidell Inc.*, 812 F.2d 534, 537 (9th Cir. 1987).

      The only exception to the general rule that issuers must honor facially valid draws

without regard to whether beneficiaries are in compliance with their obligations to applicants

arises in the case of fraud.  Under Oregon law:

> If an applicant claims that . . . honor of the [beneficiary's attempt to draw on a
> letter of credit] would facilitate a material fraud by the beneficiary on the issuer or
> applicant, a court of competent jurisdiction may temporarily or permanently
> enjoin the issuer from honoring a presentation or grant similar relief against the
> issuer or other persons only if the court finds that:
>
> > (a) The relief is not prohibited under the law applicable to an accepted
> > draft or deferred obligation incurred by the issuer;
> >
> > (b) A beneficiary, issuer or nominated person who may be adversely
> > affected is adequately protected against loss that it may suffer because the

relief is granted;

(c) All of the conditions to entitle a person to the relief under the law of this state have been met; and

(d) On the basis of the information submitted to the court, the applicant is more likely than not to succeed under its claim of forgery or material fraud and the person demanding honor does not qualify for protection under subsection (1)(a) of this section.

O.R.S. 75.1090(2).

Once a beneficiary has drawn on a letter of credit, a warranty is created by operation of law whereby the beneficiary warrants to the applicant that the draw "does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." O.R.S. 75.1100(1)(b). This warranty is created only on the condition that the issuer honors the beneficiary's draw. *See* O.R.S. 75.1100.

Although letters of credit are frequently issued in connection with suretyship arrangements, the law governing suretyships is almost entirely orthogonal to the law governing letters of credit. A suretyship, or guaranty, is the relationship that obtains among the parties when an obligee (or creditor) has recourse against a person (the surety or guarantor) or that person's property with respect to an obligation owed by an obligor (or principal) to the obligee. A suretyship creates rights and obligations among the parties independently of any express contractual agreement among the parties, although the rights and obligations that arise out of the relationship may be modified by contractual agreement.

The Oregon courts look to the substance of the parties' relationship rather than to the terms used in any contractual agreements among the parties to determine whether a suretyship exists. *See*, *e.g.*, *Ochoco Lumber Co. v. Fibrex & Shipping Co.*, 164 Or. App. 769, 777 (2000)

Page 18 - OPINION AND ORDER

(citations omitted) (finding, *inter alia*, that in consequence of "the general practice on standby letters of credit--that the issuer's obligation to pay on the letter of credit only arises if there is a default" by the principal – the existence of a standby letter of credit supports the inference that the applicant on the letter of credit is a "*de facto* surety"); *see also*, *e.g.*, *Marshall-Wells Co. v. Tenney*, 118 Or. 373, 383 (1926) (noting that letters of credit should be interpreted not strictly or technically, but rather in light of the parties' intentions in entering into them).  Thus, under Oregon law a suretyship (or guaranty) exists wherever a person agrees to answer or be responsible for the debt or obligation of another.  *See*, *e.g.*, *Chada v. Tapp*, 277 Or. 3, 6-7 (1977).

Oregon law provides that a surety is discharged of its obligations when, without the surety's consent, the principal and creditor materially alter the terms of their relationship.  *See*, *e.g.*, *Marc Nelson Oil Prods. v. Grim Logging Co.*, 199 Or. App. 73, 79 (2005) (modified on other grounds), *citing Equitable Savings & Loan v. Jones*, 268 Or. 487, 491, 492 (1974); *see also*, *e.g.*, *Lloyd Corp. v. O'Connor*, 258 Or. 33, 38 (1971); *Marshall-Wells*, 118 Or. at 385.  Where, as here, the surety is compensated rather than gratuitous, the material alteration of the principal/creditor relationship must, in addition, increase the risk to the surety or otherwise be actually or potentially detrimental to the surety.  *See*, *e.g.*, *Marc Nelson Oil*, 199 Or. App. at 79, *citing Equitable Savings & Loan*, 268 Or. at 491-92; *see also*, *e.g.*, *Lloyd*, 258 Or. at 38; *Marshall-Wells*, 118 Or. at 385.

The seeming paradox created by the availability of the suretyship defense of discharge coupled with the U.C.C. mandate that letters of credit create an irrevocable undertaking to pay – highlighted by the parties' dueling monologues in support of their respective claims to declaratory relief – is easily resolved.  As a matter of law, the application of any suretyship defense that may

Page 19 - OPINION AND ORDER

be available to CRM does not impact TriMet's right to draw on the letter of credit.  TriMet's entitlement to draw on the Letter of Credit is limited only by the terms of the Letter of Credit itself and by the fraud defense described above.  The only effect of discharge of CRM's suretyship obligations would be to give CRM a remedy against TriMet for breach of warranty under O.R.S. 75.1100(1), or for unjust enrichment, in the event TriMet drew on the letter of credit after such discharge had occurred.

**A.    Declaratory Relief Governed by Article 5 of the U.C.C.**

CRM requests this court's judgment that the Letter of Credit and all amendments thereto are null, void, and unenforceable, that the Letter of Credit has expired, that TriMet may not draw on the Letter of Credit, and that any draw request on the Letter of Credit shall be without effect. For its part, TriMet requests declarations that amount to mirror images of the declarations requested by CRM:  that the Letter of Credit, as amended, is valid and enforceable, that its draw request of October 22, 2008, complied with the terms of the Letter of Credit, and that  TriMet is entitled to draw $3 million on the Letter of Credit.[6]  Each of these requested declarations is governed by Oregon's codification of Article 5 of the U.C.C., discussed above.

As noted above, CRM's arguments in connection with available suretyship defenses are irrelevant to TriMet's rights under the Letter of Credit, which are limited only by the terms of the Letter of Credit itself and by the fraud defense codified at O.R.S. 75.1090(2).  However, also as noted above, there is a question of fact as to whether CRM is entitled to rescission of the amendment to the Letter of Credit that extended its deadline from May 15, 2008, to November

---

[6]  TriMet's request for a declaration that CRM is in default under the Contract will be addressed below.

Page 20 - OPINION AND ORDER

15, 2008. In the event that CRM were to prevail on its claim for rescission, TriMet's only attempt to draw on the Letter of Credit would have taken place after the letter had already expired, and CRM would be entitled to all of its requested declaratory relief. In the event TriMet were to prevail on CRM's rescission claim, by contrast, it would necessarily also have prevailed on CRM's fraud claim, and, in consequence, would be entitled to all of the declaratory relief it requests (other than its request for the court's declaration that CRM is in default under the Contract, discussed below). In consequence, CRM's declaratory judgment claim must be denied in its entirety, and TriMet's counterclaim for declaratory judgment must be denied to the extent TriMet seeks declarations that the Letter of Credit, as amended, is valid and enforceable, that its draw request of October 22, 2008, complied with the terms of the Letter of Credit, and that TriMet is entitled to draw $3 million on the Letter of Credit.

**B.    Declaratory Relief Governed by Suretyship Law**

TriMet requests this court's judgment that CRM is in default under the Contract. TriMet's entitlement to this relief is governed by Oregon's law of suretyship, discussed above.

**1.    Surety Status**

As a preliminary matter, it is clear as a matter of law that CRM has the status of surety with regard to Colorado Railcar's contractual obligations to TriMet, and has had that status by not later than the date the parties executed Modification 1 to the Contract. *See, e.g.*, *Ochoco Lumber*, 164 Or. App. at 777. Although it is reasonably clear that at the time TriMet and Colorado Railcar entered into the Contract, TriMet did not intend for any third party to undertake Colorado River's obligation to provide a letter of credit, the relationships among the parties and the terms of each party's contractual obligations to the others establish clearly that CRM was at all material

times a secondary obligor with respect to Colorado Railcar's obligations. *See id.* Arguably, CRM

became a surety at the time KeyBank issued the Letter of Credit, and it is indisputable that it had

surety status by the time Modification 1 provided that Colorado Railcar's default under the

Contract would constitute default by CRM for Letter of Credit purposes.

### 2.    Surety Defenses

As noted above, a surety is discharged of its obligations when, without the surety's

consent, the principal and creditor materially alter the terms of their relationship in a manner

detrimental to the surety. *See*, *e.g.*, *Marc Nelson*, 199 Or. App. at 79, *citing Equitable Savings &*

*Loan*, 268 Or. at 491, 492. CRM argues that its obligations as a surety were discharged pursuant

to this rule of law when TriMet and Colorado Railcar executed the PMA in January 2008.

### a.    The PMA

### 1.    Consent Analysis

Although it is undisputed that State was the only person with actual authority to bind

CRM to the PMA and that State did not consent to the PMA – and did not have actual knowledge

of its existence prior to June 2008 – TriMet argues that CRM is estopped from denying its

consent to the PMA because Rader, who undisputedly had knowledge of the PMA, had apparent

authority to act for CRM. TriMet's apparent authority argument fails for at least three reasons.

First, no person ever purported to consent to the PMA on behalf of CRM, in that Rader's consent

to the PMA was on behalf of Colorado Railcar, so it is immaterial whether Rader had authority to

bind CRM. Second, TriMet had actual knowledge that State was the only person with actual

authority to bind CRM to any agreement, and, under Oregon law, "it is well established that one

cannot rely upon an agent's apparent authority when he knows that the agent does not have actual

Page 22 - OPINION AND ORDER

authority or had knowledge of facts which would put him on inquiry as to the actual authority of the agent." *Minniti v. Cascade Employers Asso.*, 280 Or. 319, 329 (1977), *citing Portland v. American Surety Co.*, 79 Or. 38, 43-44 (1915).  Third, all of the evidence TriMet puts forward as operating to "cloak" Rader with apparent authority to bind CRM arises out of Rader's own conduct, and as a matter of law apparent authority cannot arise out of an agent's conduct, but rather must arise out of the conduct of the agent's principal.  *See, e.g.*, *Taylor v. Ramsay-Gerding Constr. Co.*, 345 Or. 403, 410 (2008) ("An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal").  Rader's consent to the PMA cannot, as a matter of law, have bound CRM.

## 2.    Increased Risk Analysis

TriMet argues that the PMA could not have increased CRM's risk as surety, because absent some modification to the Contract, it was a near certainty that TriMet would draw on the Letter of Credit.  According to TriMet's argument, the net effect of the PMA was, therefore, at worst to delay the inevitable and, in a best-case scenario, to create the possibility that no draw would ultimately prove necessary.

"A modification materially increases a guarantor's risk when a careful and prudent person undertaking the risk would have regarded the modification as substantially increasing the chances of loss."  *Marc Nelson*, 199 Or. App. 73, 82-83 (internal quotation marks, modifications omitted), *quoting Lloyd*, 258 Or. at 37.  "The risk to the guarantor must be either actually or potentially detrimental."  *Id.* at 83, *citing Equitable Savings & Loan*, 268 Or. at 492.  "When a modification deprives a guarantor of the remedy to proceed against the principal debtor to protect the guarantor's personal interest, the modification materially increases the guarantor's risk."  *Id.*,

Page 23 - OPINION AND ORDER

*citing Marshall-Wells*, 118 Or. at 393-95.

The PMA provided, *inter alia*, that TriMet would make "special contract payments" to or on behalf of Colorado Railcar, including payments not provided for under the Contract; TriMet was authorized to fund these special payments by drawing on the Letter of Credit; such special payments, if neither earned under the Contract nor repaid by Colorado Railcar, would become "damages" under the Contract; and TriMet was authorized to compensate itself for such special payments that Colorado Railcar failed to repay by drawing on the Letter of Credit. The net effect of the PMA was to increase the likelihood that when TriMet drew on the Letter of Credit it would be for the maximum amount, and to decrease the likelihood that, at the time the draw was made, Colorado Railcar would have resources remaining with which to reimburse CRM for its liability to KeyBank following TriMet's draw. The PMA therefore materially increased CRM's risk as surety as a matter of law.

### 3.    TriMet's Entitlement to the Requested Declaratory Relief

For reasons set forth above, it appears likely that CRM's obligations as a surety were discharged when TriMet and Colorado Railcar entered into the PMA without CRM's consent. However, also as noted above, State learned of the existence and provisions of the amended PMA in June 2008, five months prior to the date TriMet attempted to draw on the Letter of Credit (and there is a question of fact as to whether Rader's knowledge of the PMA may have been imputable to CRM by as early as April 2008), and, after obtaining the advice of counsel, took no action to notify TriMet that it was taking the position that its surety obligations had thereby been discharged.

The questions whether CRM's silence can be construed as effectively waiving its

suretyship defenses, as a breach of the covenant of good faith and fair dealing, or as giving rise to implied consent to the PMA, have not been briefed to the court. I take no position at this time as to whether any of these issues present a pure question of law or a mixed question of law and fact, or as to whether they could be determined on the basis of facts in the current evidentiary record. Nevertheless, I am unwilling to find as a matter of law that CRM's suretyship obligations have effectively been discharged in the absence of briefing from the parties on these issues.

In consequence, although I find that TriMet is not entitled to summary judgment as to its claim for declaratory judgment that CRM is in default under the Contract, I do not hold at this time as a matter of law that CRM has established the discharge of its obligations as surety. The discharge question issue must await resolution until such time as the consequences, if any, of CRM's silence have been briefed to the court.

## CONCLUSION

For the reasons set forth above, CRM's motion (#37) for partial summary judgment and TriMet's motion (#49) for summary judgment are each denied. At the court appearance scheduled for 2:30 p.m. on September 21, 2009, counsel for the parties should be prepared to

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 25 - OPINION AND ORDER

discuss whether further summary judgment proceedings are warranted in light of the court's disposition of the parties' motions.

Dated this 18th day of September, 2009.

 /s/  Paul Papak
Honorable Paul Papak
United States Magistrate Judge