IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FILED

NOV 1 3 2009

CRM COLLATERAL II, INC.,

      Plaintiff,

CV 08-1266-PK (LEAD)

OPINION AND
ORDER

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

      Defendant.

_____

MARK GUETZKO, LISA GUETZKO,
RICHARD ALTORFER, SEEDORFF
MASONRY, INC., DALE KARTMAN,
SUSAN KARTMAN, and SEEDORFF
PARTNERSHIP, LLP,

      Plaintiffs,

CV 09-1135-PK

v.

CRM COLLATERAL II, INC.,

      Intervenor Plaintiff,

v.

KEYBANK NATIONAL ASSOC.,

       Defendant,

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

       Intervenor Defendant.

---

PAPAK, Magistrate Judge:

Plaintiffs Mark Guetzko, Lisa Guetzko, Richard Altorfer, Seedorff Masonry, Inc., Dale

Kartman, Susan Kartman, and Seedorff Partnership, LLP, filed this action against defendant

KeyBank National Association ("KeyBank"), Raymond James Financial Services, and Jeffrey

State on November 5, 2008, in the Iowa District Court for Clayton County.  Plaintiffs moved for,

and received, an injunction from the Iowa state court enjoining KeyBank from honoring a draw

by Tri-County Metropolitan Transportation District of Oregon ("TriMet") on Irrevocable Standby

Letter of Credit No. 312084 (the "Letter of Credit") dated November 17, 2006, as to which CRM

Collateral II, Inc. ("CRM"), was the applicant, TriMet was the beneficiary, and KeyBank was the

issuer.  Shortly thereafter, plaintiffs voluntarily dismissed Raymond James Financial Services

and Jeffrey State as defendants.  On November 12, 2008, the action was removed to the federal

district court for the Northern District of Iowa.

On November 14, 2008, TriMet moved to intervene in the action, simultaneously

Page 2 - OPINION AND ORDER

attempting to move for dissolution of the injunction that had been entered against KeyBank in the Iowa state court. On December 4, 2008, TriMet's motion to intervene was granted, and on that same date the court permitted TriMet to file its motion to dissolve. On January 22, 2009, CRM likewise moved to intervene. CRM's motion was granted on February 25, 2009. Subsequently, on September 22, 2009 – while TriMet's motion to dissolve remained pending – the court for the Northern District of Iowa transferred this action to the District of Oregon. On October 5, 2009, TriMet renewed its motion to dissolve the injunction against KeyBank.

On October 22, 2009, this court consolidated this action ("*Guetzko v. KeyBank*") with an action previously filed in this court, *CRM Collateral II Inc. v. Tri-County Metropolitan Transportation District of Oregon*, CV-08-1266-PK ("*CRM v. TriMet*"), with *CRM v. TriMet* designated as the lead case and *Guetzko v. KeyBank* designated as a member case in the consolidated action.

Now before the court is TriMet's renewed motion (#49) to dissolve the injunction entered against KeyBank in the Iowa state court. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings on file. For the following reasons, TriMet's motion is granted.

## LEGAL STANDARDS

The courts of the Ninth Circuit look to the substance of a motion seeking modification or dissolution of an injunction to determine whether it should be treated as a motion for reconsideration under Federal Civil Procedure Rule 59[1] or a motion for dissolution or

---

[1] Federal Civil Procedure Rule 59 provides a mechanism for altering or amending a "judgment." Fed. R. Civ. P. 59. Federal Civil Procedure Rule 54 defines "judgment" to include "any order from which an appeal lies." Fed. R. Civ. P. 54(a). "Because 28 U.S.C. § 1292(a)(1)

modification under Federal Civil Procedure Rule 54. *See Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005), *quoting Favia v. Ind. Univ. of Pa.*, 7 F.3d 332, 337 (3d Cir. 1993). Where, as here, such a motion seeks to relitigate issues underlying the grant of the original injunctive relief, rather than raising arguments premised on new circumstances not present at the time the original relief was granted, the motion is construed as arising under Rule 59. *See id.*

"Under Rule 59(e), it is appropriate to alter or amend a judgment if '(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law.'" *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 780 (9th Cir. 2009), *quoting Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001).

## FACTUAL BACKGROUND

### I.     Material Underlying Facts

In November 2005, TriMet entered into Contract No. RH030433LE (the "Contract") with third party Colorado Railcar Manufacturing, LLC ("Colorado Railcar"), pursuant to which Colorado Railcar would manufacture and TriMet would purchase three railcars and one trailer for TriMet's use in connection with its Westside Express Service ("WES") between Beaverton, OR, and Wilsonville, OR. TriMet's price for the railcars and trailers was initially fixed at $17,821,806, but was subsequently reduced, first to $17,481,135 and later to $17,299,135. The Contract required Colorado Railcar to maintain an irrevocable standby letter of credit in the

---

establishes appellate jurisdiction over an appeal from a preliminary injunction, a preliminary injunction order is a 'judgment,'" *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1123, n. 6 (9th Cir. 2005), and is therefore within the scope of Rule 59.

amount of $3 million continuously from the time it issued notification that manufacture would begin to the final delivery of railcars and trailers to TriMet.

CRM was incorporated November 13, 2006, for the purpose, among other potential legal purposes, of fulfilling Colorado Railcar's letter of credit obligation under the Contract. Colorado Railcar's CEO, Thomas Rader, is one of CRM's two corporate directors, and Colorado Railcar's CFO, John Thompson, was CRM's registered agent at the time CRM was incorporated. CRM's second corporate director and its sole corporate officer (both its President and its Treasurer) was Scott State,[2] who worked with Colorado Railcar as a consultant from 2004 through 2007.

On November 17, 2006, Colorado Railcar, CRM, and the plaintiffs to this action entered into an Investment Agreement whereby Colorado Railcar agreed to pay plaintiffs and CRM to maintain a letter of credit in satisfaction of Colorado Railcar's obligation to do so under the Contract. That same day, CRM obtained the Letter of Credit from KeyBank. The Letter of Credit identified CRM as the "applicant" and TriMet as the "beneficiary." The terms of the Letter of Credit required TriMet to certify in writing that CRM was in default under the Contract – although CRM was not at that time a party to the Contract – in order to draw on the letter as its beneficiary. As originally issued, the expiration date of the Letter of Credit was November 15, 2007.

In April 2007, TriMet learned for the first time that CRM was the applicant on the Letter of Credit. Effective April 20, 2007, TriMet, Colorado Railcar, and CRM agreed to a written modification of the Contract (Modification No. 1), pursuant to which CRM became a party to the Contract for the sole purpose of making a default by Colorado Railcar under the Contract

---

[2] Former defendant Jeffrey State is Scott State's brother.

Page 5 - OPINION AND ORDER

constitute a default by CRM for purposes of the Letter of Credit. Rader represented CRM in the negotiation of Modification No. 1, and State signed Modification No. 1 on CRM's behalf. In addition, in connection with Modification No. 1 CRM supplied to TriMet certain organizational resolutions issued by CRM's board of directors providing that only officers of the corporation – namely, Scott State and no other person – were authorized to enter into agreements on CRM's behalf.

In October 2007, the parties agreed to extend the Letter of Credit's expiration date from November 15, 2007, to May 15, 2008. Rader and Thompson participated in the extension negotiations, and Scott State did not, although he ultimately signed the amendment that effected the extension.

On January 16, 2008, TriMet and Colorado Railcar entered into a Project Monitoring Agreement (the "PMA") that modified their rights and obligations under the Contract. CRM was not a party to the PMA, nor was CRM directly advised that the PMA had been executed – that is, Scott State was not advised, although Rader was necessarily aware of the PMA in consequence of his status as Colorado Railcar's CEO. The PMA modified the relationship between Colorado Railcar and TriMet, in relevant part, as follows: under the PMA, TriMet would make "special contract payments" to or on behalf of Colorado Railcar, including payments not provided for under the Contract; TriMet was authorized to fund these special payments by drawing on the Letter of Credit; such special payments, if neither earned under the Contract nor repaid by Colorado Railcar, would become "damages" under the Contract; and TriMet was authorized to compensate itself for such special payments that Colorado Railcar failed to repay by drawing on the Letter of Credit. In addition, under the PMA a "financial monitor" was appointed to oversee

Page 6 - OPINION AND ORDER

Colorado Railcar's operations, and TriMet was given authority to approve or disapprove of Colorado Railcar's budgets and expenditures.

The PMA was modified on February 21, 2008, primarily to add Alaska Railroad Corporation as an additional party. CRM was not a party to the amended PMA, nor was the amended PMA disclosed directly to CRM.

In April 2008, the parties agreed to a second extension of the expiration date of the letter of Credit, from May 15, 2008, to November 15, 2008. Rader and Thompson were involved in the negotiation of the extension and Scott State was not, although he signed the amendment that effected the extension. No party informed Scott State of the existence of the PMA or amended PMA prior to CRM's consent to the extension.

In June 2008, Thompson advised Scott State of the existence of the amended PMA, which Thompson characterized as an agreement that he had not been "involved with." Deposition of Scott State ("Scott State Dep.") at 153:11. Scott State requested that Thompson send him a copy of the amended PMA, and Thompson did so. Scott State Dep. at 153:13-19. Scott State read the amended PMA and understood, at a minimum, that it "purported to give TriMet the right to call on the [L]etter of [C]redit to compensate [itself] for special contract payments under the PMA." Scott State Dep. at 157:17-19. Scott State did not contact TriMet to discuss the amended PMA or its impact on CRM's obligations under the Letter of Credit at that time, but rather discussed the matter with KeyBank and hired an attorney to represent him and/or CRM. Scott State Dep. at 157:20 - 158:10.

In or around September or October 2008, Colorado Railcar completed the manufacture and delivery of the railcars and trailer, and shortly thereafter ceased operations. Prior to the

Page 7 - OPINION AND ORDER

completion date, TriMet made more than $5.5 million in special contract payments to Colorado Railcar under the auspices of the PMA and amended PMA. On October 22, 2008, TriMet attempted to draw on the Letter of Credit to reimburse itself for $3 million of those special contract payments.

## II.    Relevant Procedural History

On October 27, 2008, CRM and Richard Altorfer[3] filed the *CRM v. TriMet* action, simultaneously moving for a temporary restraining order to enjoin KeyBank from honoring TriMet's draw request of October 22, 2008. Judge King granted the *CRM* plaintiffs' motion, and set a preliminary injunction hearing for November 7, 2008. On November 5, 2008, plaintiffs filed this action against KeyBank, Raymond James Financial Services, and Jeffrey State in the state court for Clayton County, Iowa, likewise moving to enjoin TriMet's draw request. On November 7, 2008, the Iowa court granted plaintiffs' motion for a temporary injunction. In consequence, the preliminary injunction hearing set in the *CRM v. TriMet* action did not take place and the TRO entered by Judge King was permitted to lapse.

On November 12, 2008, KeyBank removed the Clayton County action to the federal Northern District of Iowa, and on November 14, 2008, TriMet moved to intervene on an expedited basis. Also on November 14, 2008, TriMet attempted to file a motion to dissolve the injunction against KeyBank, but its filing was not accepted until December 4, 2008, the date the court for the Northern District of Iowa granted TriMet's motion to intervene.

On January 22, 2009, CRM also moved to intervene in the Iowa action. On February 25,

---

[3] Altorfer was voluntarily dismissed as a plaintiff to the *CRM v. TriMet* action on November 4, 2008.

Page 8 - OPINION AND ORDER

2009, its motion was granted.

On September 18, 2009, in the *CRM v. TriMet* action, this court denied both CRM's motion for partial summary judgment and TriMet's cross-motion for summary judgment. In relevant part, the court denied TriMet's motion for summary judgment as to CRM's claim of material fraud. In connection with its fraud claim, CRM alleged in its complaint that TriMet had fraudulently obtained extension of the expiration date of the Letter of Credit from May 15, 2008, to November 15, 2008, by concealing certain material facts from CRM at the time the extension was negotiated. I ruled that the evidentiary record did not foreclose all possible theories upon which TriMet could be found liable for fraud.

On September 22, 2009, the Iowa action was transferred to this court, no ruling having yet been entered on TriMet's motion to dissolve the injunction against TriMet. TriMet renewed its motion to dissolve in this court on October 5, 2009.

On October 22, 2009, this action was consolidated with the *CRM v. TriMet* action. *CRM v. TriMet* was designated as the lead case and *Guetzko v. KeyBank* was designated as a member case in the consolidated action.

## ANALYSIS

As noted above, on November 7, 2008, the state court for Clayton County, Iowa, entered a "temporary injunction" enjoining KeyBank from honoring TriMet's request of October 22, 2008, to draw on the Letter of Credit. Following removal to the federal court, the state court's injunction was "federalized," and is now to be construed as though it had been granted in federal court. *See Preaseau v. Prudential Ins. Co.*, 591 F.2d 74, 79 (9th Cir. 1979), *quoting Butner v. Neustadter*, 324 F.2d 783, 785 (9th Cir. 1963). As will be discussed in greater detail below,

Page 9 - OPINION AND ORDER

analysis of the Iowa Rules of Civil Procedure establishes that an Iowan temporary injunction is the equivalent of a federal *preliminary* injunction. *See, e.g.*, Iowa R. Civ. P. 1.5101; Fed. R. Civ. P. 65(a). I therefore construe the injunction entered against KeyBank by the Iowa state court as though it were a preliminary injunction entered pursuant to Federal Civil Procedure Rule 65(a).

Before the court is TriMet's motion to dissolve the injunction entered against KeyBank on November 7, 2008. TriMet's motion is construed as a motion for reconsideration arising under Federal Civil Procedure Rule 59.[4] *See Credit Suisse First*, 400 F.3d at 1124.

Rule 59(e) provides that a motion for reconsideration of a judgment must be filed within ten days after the judgment was entered. Here, the subject injunction was entered November 7, 2008, and the motion for reconsideration not accepted for filing until December 4, 2008. However, because TriMet was not a party to this action at the time the injunction was entered, and filed its motion within ten days of the date that its motion to intervene in this action was granted, the motion is deemed timely for purposes of Rule 59(e).

TriMet offers the argument that the court is required to dissolve the injunction as a matter of law without regard to whether it properly issued in the first instance, citing in support the ten-day limit for the duration of a temporary restraining order provided in Federal Civil Procedure Rule 65(b)(2). This argument relies on a false premise, namely an invalid assertion of

---

[4] TriMet argues that the court's power to dissolve the injunction arises, not under Rule 59, but rather under 28 U.S.C. § 1450. Section 1450 provides, in relevant part, that "injunctions, orders, and other proceedings had in [a state] action prior to its removal [to federal court] shall remain in full force and effect until dissolved or modified by the district court." 28 U.S.C. § 1450. However, while Section 1450 acknowledges the district court's power to modify or dissolve state-court-ordered injunctions following removal, it neither expressly creates that power nor provides any specific mechanism for effecting such modification or dissolution. Rule 59, by contrast, expressly provides a mechanism for modifying or dissolving injunctions.

Page 10 - OPINION AND ORDER

equivalency between an Iowan temporary *injunction* and a federal temporary *restraining order*.

Under federal law, a temporary restraining order may be entered with or without notice to the

opposing party, and may endure for only a maximum of ten days unless formally extended for a

like period of time, *see* Fed. R. Civ. P. 65(b), whereas a preliminary injunction may only be

entered following a noticed hearing and may last for the duration of a legal action, *see* Fed. R.

Civ. P. 65(a).  Under the Iowa Rules of Civil Procedure, no provision is made for entry of a

temporary injunction without notice to the opposing party, and temporary injunctions apparently

may endure until entry of judgment.  *See* Iowa R. Civ. P. 1.1501.  The ten-day limit imposed on

temporary restraining orders under Rule 65(b)(2) is thus inapplicable to the injunction at issue

here.

Apparently in the alternative, TriMet argues that the injunction should be dissolved on the

ground that the issuing court committed clear error[5] in granting plaintiffs' motion for injunctive

relief.  Oregon's codification of the Uniform Commercial Code provides that "[r]ights and

obligations of an issuer to a beneficiary or a nominated person under a letter of credit are

independent of the existence, performance or nonperformance of a contract or arrangement out of

which the letter of credit arises or which underlies it, including contracts or arrangements

between the issuer and the applicant and between the applicant and the beneficiary."  O.R.S.

75.1030(4).  This so-called "independence principle" may not be modified or varied by

agreement among the parties to a letter of credit.  *See* O.R.S. 75.1030(3).  Thus, issuers of letters

of credit must honor facially proper draws on letters of credit by beneficiaries, without regard to

---

[5] Clear error is a ground on which a previously entered judgment may be modified or
dissolved.  *See United Nat'l Ins.*, 555 F.3d at 780.

Page 11 - OPINION AND ORDER

the rights or obligations obtaining between the applicant and the beneficiary of the letter of

credit. *See, e.g.*, O.R.S. 75.1030(4); O.R.S. 75.1030(3); *Western Sur. Co. v. Bank of S. Or.*, 257

F.3d 933, 936 (9th Cir. 2001) (applying Oregon law), *citing Andy Marine, Inc. v. Zidell Inc.*, 812

F.2d 534, 537 (9th Cir. 1987).

The only exception to the independence principle is the fraud exception, applicable where

it would facilitate material fraud by the beneficiary to honor the beneficiary's draw request:

> If an applicant claims that . . . honor of the [beneficiary's attempt to draw on a
> letter of credit] would facilitate a material fraud by the beneficiary on the issuer or
> applicant, a court of competent jurisdiction may temporarily or permanently
> enjoin the issuer from honoring a presentation or grant similar relief against the
> issuer or other persons only if the court finds that:
>
>> (a) The relief is not prohibited under the law applicable to an accepted
>> draft or deferred obligation incurred by the issuer;
>>
>> (b) A beneficiary, issuer or nominated person who may be adversely
>> affected is adequately protected against loss that it may suffer because the
>> relief is granted;
>>
>> (c) All of the conditions to entitle a person to the relief under the law of
>> this state have been met; and
>>
>> (d) On the basis of the information submitted to the court, the applicant is
>> more likely than not to succeed under its claim of forgery or material fraud
>> and the person demanding honor does not qualify for protection under
>> subsection (1)(a) of this section.

O.R.S. 75.1090(2). TriMet argues that the information submitted to this court does not establish

that CRM is "more likely than not to succeed under its claim of . . . material fraud," and on that

basis argues that the injunction improperly issued.

In its complaint in the *CRM v. TriMet* action, CRM alleged that TriMet fraudulently

obtained CRM's consent to the extension of the Letter of Credit's expiration date from May 15,

2008, to November 15, 2008, by concealing from CRM the existence of the PMA, TriMet's right

under the PMA to draw on the Letter of Credit to reimburse itself for payments authorized under

the PMA but not under the Contract, and the state of Colorado Railcar's finances at the time the

extension was negotiated.  No other allegations of fraud have been raised before this court, either

in this action or in the *CRM v. TriMet* action.

This court has already had occasion to consider the merits of CRM's fraud claim.  As

discussed in greater detail in my Opinion and Order of September 18, 2009 (*CRM v. TriMet*,

Docket No. 84), a plaintiff must prove each of the following elements by clear and convincing

evidence in order to establish a defendant's liability for fraud under Oregon law: "(1) a

representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or

ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner

reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8)

his right to rely thereon; and (9) his consequent and proximate injury." *Webb v. Clark*, 274 Or.

387, 391 (1976); *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89 (1995);[6] *Coy v. Starling*, 53

Or. App. 76, 80 (Or. Ct. App. 1981), *citing, e.g., Krause v. Eugene Dodge, Inc.*, 265 Or. 486, 502

(1973).  For present purposes, the crux of the matter now before the court is the issue of TriMet's

intent that CRM rely on its alleged suppression of material facts it was bound, in good faith, to

disclose.

In my Opinion and Order of September 18, 2009, I was unable to "conclude on the basis

of the evidentiary record now before the court that no reasonable trier of fact could find that

---

[6] Some Oregon courts consolidate the nine elements of a claim for fraud down to a list of
five, but the same essential requirements are present whether enumerated as five or nine
elements.

TriMet intended to obtain CRM's consent [to the extension of the Letter of Credit] by failing to

disclose material facts." However, in analyzing the evidentiary record, I also found as follows:

> There is no question but that TriMet intended to obtain CRM's consent to the
> extension of the Letter of Credit's expiration date. However, that undisputed fact
> does not imply that TriMet intended to obtain CRM's consent *in consequence of*
> its ignorance of the PMA or of Colorado Railcar's stipulation of default. Indeed,
> facts in the record arguably suggest the contrary: TriMet negotiated the extension
> with Rader, one of CRM's two corporate directors, whom it knew to be
> necessarily apprised of both the PMA and Colorado Railcar's stipulation. This is
> consistent with the theory that TriMet intended to negotiate in good faith without
> concealment of material facts.

My current analysis of the evidentiary record suggests no reason to deviate from my

previous finding. While it is logically possible that CRM will ultimately prevail on its fraud

claim, in fact it appears more likely than not that instead it will fail to do so. Because injunctive

relief to enjoin the issuer of a letter of credit from honoring a beneficiary's presentation requires

the court to determine on the basis of the information submitted to it that "the applicant is more

likely than not to succeed under its claim of forgery or material fraud," O.R.S. 75.1090(2)(d), it

would have been clear error for a federal court to issue a preliminary injunction preventing

KeyBank from honoring TriMet's draw request.

The plaintiffs and CRM assert that, despite the foregoing, it would be premature to

dissolve the injunction before a final ruling issues in the *CRM v. TriMet* action, arguing that the

court should rule as to whether CRM has been discharged of its underlying suretyship obligations

before deciding whether TriMet has a right to the proceeds from the Letter of Credit. This

argument necessarily fails as a matter of law, because the law governing letters of credit clearly

contemplates that, in the event of a dispute as to the obligations underlying a letter of credit, it is

the beneficiary of the letter of credit that should hold the proceeds until such time as the dispute

Page 14 - OPINION AND ORDER

is resolved. *See* O.R.S. 75.1030(4). The plaintiffs and CRM further argue that, in light of the fact that the question of discharge is ripe for decision, it would be inequitable to dissolve the injunction at this time if CRM is entitled to judgment discharging its obligations as surety. This argument likewise fails as a matter of law, because even a full discharge of CRM's suretyship obligations would not act as a bar to TriMet's right to draw on the Letter of Credit. *See id.*

The plaintiffs also assert that they would suffer irreparable harm if TriMet's draw request were honored, because honor of the request would cause KeyBank to foreclose on certain of their assets held in security against such a draw. As a factual matter, this assertion is cast into doubt by KeyBank's assertion, discussed below, that plaintiffs have been enjoined in yet another Clayton County action from surrendering those assets. Nevertheless, even if true, this is the very result the parties contemplated and contracted for when they entered into the agreements that are the subject of this litigation. I will not balk at dissolving the injunction for the reason that doing so might cause the plaintiffs to be held to the letter of their bargain.

KeyBank, for its part, offers two reasons why the injunction should not be dissolved, applicable law notwithstanding. First, it asserts that to dissolve the injunction before resolving CRM's pending fraud claim would require it to "substitute its judgment for the court's" in determining whether it should honor TriMet's draw request. However, the law only *permits* KeyBank to dishonor a draw request if it has reason to believe the request would facilitate material fraud, and does not *require* it to do so. KeyBank will not violate applicable law by honoring the draw request, regardless of the outcome of CRM's action against TriMet.

Second, KeyBank advises the court that, in an action still pending in the Clayton County court, plaintiffs have been enjoined from surrendering the securities that served as collateral for

Page 15 - OPINION AND ORDER

the $3 million obligation owed under the Letter of Credit.  KeyBank argues that it would be irreparably harmed if it were required to pay TriMet $3 million without recourse to those assets. While I sympathize with KeyBank's plight, its remedy is to seek dissolution of the injunction against the plaintiffs in the still-pending Iowa state action, rather than to frustrate the proper operation of law in this one.

Because it would have been clear error for a federal court, under the facts presented in this consolidated action, to issue a preliminary injunction to enjoin KeyBank from honoring TriMet's draw request of October 22, 2008, and because no reason exists to defer or delay dissolution of the injunction, TriMet is entitled to immediate dissolution of the temporary injunction of November 7, 2008.

## CONCLUSION

For the reasons set forth above, TriMet's motion (#49) to dissolve is granted.  KeyBank is no longer enjoined from honoring TriMet's October 22, 2008, request or any future request to draw on Irrevocable Standby Letter of Credit No. 312084.

Dated this 13th day of November, 2009.

Honorable Paul Papak
United States Magistrate Judge