IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FILED

DEC 2 2 2009

CRM COLLATERAL II, INC.,

        Plaintiff,

                                   CV 08-1266-PK (LEAD)

                                   OPINION AND
v.                                   ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

        Defendant.

MARK GUETZKO, LISA GUETZKO,
RICHARD ALTORFER, SEEDORFF
MASONRY, INC., DALE KARTMAN,
SUSAN KARTMAN, and SEEDORFF
PARTNERSHIP, LLP,

        Plaintiffs,

                                   CV 09-1135-PK

v.

CRM COLLATERAL II, INC.,

        Intervenor Plaintiff,

Page 1 - OPINION AND ORDER

v.

KEYBANK NATIONAL ASSOC.,

      Defendant,

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

      Intervenor Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff CRM Collateral II, Inc. ("CRM"), and Richard Altorfer filed the lead case in this

consolidated action against Tri-County Metropolitan Transportation District of Oregon

("TriMet") and KeyBank National Association ("KeyBank") on October 27, 2008. On November

4, 2008, Altorfer was voluntarily dismissed as a plaintiff. On November 10, 2008, TriMet filed a

counterclaim for declaratory relief. CRM voluntarily dismissed KeyBank as a party to the action

on January 20, 2009. On October 22, 2009, the lead case was consolidated with *Guetzko v.*

*KeyBank*, Case No. CV-09-1135-PK.

      Now before the court are those issues raised by CRM's motion (#37) for partial summary

judgment and TriMet's motion (#49) for summary judgment that were expressly left open

following my Opinion and Order (#84) of September 18, 2009, by which I denied the parties'

cross-motions but invited supplemental briefing as to specified legal issues not addressed in the

record then before the court. In addition, TriMet's Memorandum (#87) Regarding Supplemental

Page 2 - OPINION AND ORDER

Summary Judgment Issues contains an express request for reconsideration of my finding that

CRM's risks *qua* surety were materially increased when TriMet entered into a Project Monitoring

Agreement with Colorado Railcar on January 16, 2008. I have considered the parties'

supplemental briefing, as well as the parties' cross-motions, oral argument on behalf of the

parties, and all of the pleadings on file. For the following reasons, each parties' supplemental

briefing is construed as raising a timely motion for reconsideration of the Opinion and Order

(#84) of September 18, 2009, as to the issues discussed in the supplemental briefing only. The

constructive motion for reconsideration implicit in CRM's Supplemental Memorandum (#86) in

Support of Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and

the constructive and express motions for reconsideration contained in TriMet's Memorandum

(#87) Regarding Supplemental Summary Judgment Issues are denied.

## LEGAL STANDARDS

### I.    Cross-Motions for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996). The substantive law governing a claim or defense

determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d

365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## II. Motion for Reconsideration

It is appropriate to alter or amend a judgment under Federal Civil Procedure Rule 59(e) if "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 780 (9th Cir. 2009), *quoting Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001).

## FACTUAL BACKGROUND

In November 2005, TriMet entered into Contract No. RH030433LE (the "Contract") with third party Colorado Railcar Manufacturing, LLC ("Colorado Railcar"), pursuant to which Colorado Railcar would manufacture and TriMet would purchase three railcars and one trailer for TriMet's use in connection with its Westside Express Service ("WES") between Beaverton, OR,

and Wilsonville, OR. TriMet's price for the railcars and trailers was initially fixed at $17,821,806, but was subsequently reduced, first to $17,481,135 and later to $17,299,135. The Contract required Colorado Railcar to maintain an irrevocable standby letter of credit in the amount of $3 million continuously from the time it issued notification that manufacture would begin to the final delivery of railcars and trailers to TriMet.

CRM was incorporated November 13, 2006, for the purpose, among other potential legal purposes, of fulfilling Colorado Railcar's letter of credit obligation under the Contract. Colorado Railcar's CEO, Thomas Rader, is one of CRM's two corporate directors, and Colorado Railcar's CFO, John Thompson, was CRM's registered agent at the time CRM was incorporated. CRM's second corporate director and its sole corporate officer (both its President and its Treasurer) was Scott State,[1] who worked with Colorado Railcar as a consultant from 2004 through 2007.

On November 17, 2006, Colorado Railcar, CRM, and the *Guetzko v. KeyBank* plaintiffs entered into an Investment Agreement whereby Colorado Railcar agreed to pay the *Guetzko v. KeyBank* plaintiffs and CRM to maintain a letter of credit in satisfaction of Colorado Railcar's obligation to do so under the Contract. That same day, CRM obtained the Letter of Credit from KeyBank. The Letter of Credit identified CRM as the "applicant" and TriMet as the "beneficiary." The terms of the Letter of Credit required TriMet to certify in writing that CRM was in default under the Contract – although CRM was not at that time a party to the Contract – in order to draw on the letter as its beneficiary. As originally issued, the expiration date of the Letter of Credit was November 15, 2007.

In April 2007, TriMet learned for the first time that CRM was the applicant on the Letter

---

[1] Former defendant Jeffrey State is Scott State's brother.

of Credit.  Effective April 20, 2007, TriMet, Colorado Railcar, and CRM agreed to a written

modification of the Contract (Modification No. 1), pursuant to which CRM became a party to the

Contract for the sole purpose of making a default by Colorado Railcar under the Contract

constitute a default by CRM for purposes of the Letter of Credit.  Rader represented CRM in the

negotiation of Modification No. 1, and State signed Modification No. 1 on CRM's behalf.  In

addition, in connection with Modification No. 1 CRM supplied to TriMet certain organizational

resolutions issued by CRM's board of directors providing that only officers of the corporation –

namely, Scott State and no other person – were authorized to enter into agreements on CRM's

behalf.

     In October 2007, the parties agreed to extend the Letter of Credit's expiration date from

November 15, 2007, to May 15, 2008.  Rader and Thompson participated in the extension

negotiations, and Scott State did not, although he ultimately signed the amendment that effected

the extension.

     On January 16, 2008, TriMet and Colorado Railcar entered into a Project Monitoring

Agreement (the "PMA") that modified their rights and obligations under the Contract.  CRM was

not a party to the PMA, nor was CRM directly advised that the PMA had been executed – that is,

Scott State was not advised, although Rader was necessarily aware of the PMA in consequence

of his status as Colorado Railcar's CEO.  The PMA modified the relationship between Colorado

Railcar and TriMet, in relevant part, as follows:  under the PMA, TriMet would make "special

contract payments" to or on behalf of Colorado Railcar, including payments not provided for

under the Contract; TriMet was authorized to fund these special payments by drawing on the

Letter of Credit; such special payments, if neither earned under the Contract nor repaid by

Colorado Railcar, would become "damages" under the Contract; and TriMet was authorized to compensate itself for such special payments that Colorado Railcar failed to repay by drawing on the Letter of Credit. In addition, under the PMA a "financial monitor" was appointed to oversee Colorado Railcar's operations, and TriMet was given authority to approve or disapprove of Colorado Railcar's budgets and expenditures.

The PMA was modified on February 21, 2008, primarily to add Alaska Railroad Corporation as an additional party. CRM was not a party to the amended PMA, nor was the amended PMA disclosed directly to CRM.

In April 2008, the parties agreed to a second extension of the expiration date of the letter of Credit, from May 15, 2008, to November 15, 2008. Rader and Thompson were involved in the negotiation of the extension and Scott State was not, although he signed the amendment that effected the extension. No party informed Scott State of the existence of the PMA or amended PMA prior to CRM's consent to the extension.

In June 2008, Thompson advised Scott State of the existence of the amended PMA, which Thompson characterized as an agreement that he (Thompson) had not been "involved with." Deposition of Scott State ("Scott State Dep.") at 153:11. Scott State requested that Thompson send him a copy of the amended PMA, and Thompson did so. Scott State Dep. at 153:13-19. Scott State read the amended PMA and understood, at a minimum, that it "purported to give TriMet the right to call on the [L]etter of [C]redit to compensate [itself] for special contract payments under the PMA." Scott State Dep. at 157:17-19. Scott State did not contact TriMet to discuss the amended PMA or its impact on CRM's obligations under the Letter of Credit at that time, but rather discussed the matter with KeyBank and hired an attorney to

represent him and/or CRM. Scott State Dep. at 157:20 - 158:10. Scott State's discussions with KeyBank are described in more detail below.

In or around September or October 2008, Colorado Railcar completed the manufacture and delivery of the railcars and trailer, and shortly thereafter ceased operations. Prior to the completion date, TriMet made more than $5.5 million in special contract payments to Colorado Railcar under the auspices of the PMA and amended PMA. On October 22, 2008, TriMet attempted to draw on the Letter of Credit to reimburse itself for $3 million of those special contract payments.

## ANALYSIS

The Opinion and Order (#84) of September 18, 2009, expressly left open certain legal issues that had not been briefed or had been inadequately addressed in the parties' summary judgment briefing. In connection with the "material, false representation" and "justifiable reliance" elements of CRM's claim that TriMet obtained CRM's consent to the April 2008 extension of the Letter of Credit by fraud, I expressly did not determine whether Rader's or Thompson's knowledge of the existence and terms of the PMA could be imputed to CRM. In the event Rader's knowledge were imputed to CRM by operation of law, the fraud claim would necessarily fail because CRM would be unable to establish that TriMet failed to disclose the existence of the PMA and/or justifiable reliance on TriMet's alleged failure to disclose. For reasons described in the Order, if the fraud claim were to fail, so too would CRM's claim for rescission and, in consequence, TriMet would be entitled to the declarations it seeks that the Letter of Credit, as amended, is valid and enforceable, that its draw request of October 22, 2008, complied with the terms of the Letter of Credit, and that it is entitled to draw $3 million on the

Letter of Credit.

TriMet's entitlement to its requested declaration that CRM was at material times in default under the Contract hinges on whether CRM enjoys enforceable defenses to its obligations as Colorado Railcar's surety. Although I determined in my Opinion and Order of September 18, 2009, that such suretyship defenses arose as a matter of law when TriMet and Colorado Railcar entered into the PMA without notifying CRM, I expressly did not determine whether CRM's subsequent failure to notify TriMet that its suretyship defenses were discharged upon learning of the existence and terms of the PMA in June 2008 constituted waiver of the suretyship defenses, consent to the PMA, or breach of the implied covenant of good faith and fair dealing. In the event CRM's suretyship defenses were found enforceable, CRM would be entitled to entry of summary judgment in its favor as to TriMet's requested declaration that CRM was in default under the Contract.

In the analysis that follows, I assume the parties' familiarity with all facts and legal issues discussed in the Opinion and Order (#84) of September 18, 2009. I do not reconsider herein any legal issue addressed in the Order except as raised by the parties' supplemental briefing.

## I.    Procedural Posture

Because the court has already issued rulings on the parties' cross-motions for summary judgment, I construe each of CRM's Supplemental Memorandum (#86) in Support of Plaintiff's Motion for Summary Judgment and TriMet's Memorandum (#87) Regarding Supplemental Summary Judgment Issues as raising a timely motion for reconsideration of the Opinion and Order (#84) of September 18, 2009, as to the issues discussed in the supplemental briefing only.

## II.  Imputability of Rader's or Thompson's Knowledge of the PMA to CRM

It is well settled in Oregon that "[a]n agent's knowledge acquired within the scope of the agency is imputed to the principal, regardless of whether the agent actually communicates that knowledge to the principal." *Benson v. State*, 196 Or. App. 211, 217 (2004), *citing Hogan v. Alum. Lock Shingle Corp*, 214 Or. 218, 228 (1958). However, the Oregon courts further recognize an "adverse interest" exception to that general rule, whereby a principal is not charged with its agent's knowledge if "the agent's *relations to the subject matter are so adverse as to practically destroy the relationship*, as when the agent is acting in his own interest and adversely to that of his principal, or is secretly engaged in attempting to accomplish a fraud which would be defeated by a disclosure to his principal." *FDIC v. Smith*, 328 Or. 420, 429 (1999) (emphasis original), *quoting Saratoga Inv. Co. v. Kern*, 76 Or. 243, 254 (1915).

For the reasons that follow, I find that questions of material fact preclude entry of summary judgment in TriMet's favor as to CRM's claim of fraud. TriMet's constructive motion for reconsideration implicit in its supplemental briefing is therefore denied as to CRM's claims for fraud, rescission, and judicial declaration that the Letter of Credit, as amended, is valid and enforceable, that TriMet's draw request of October 22, 2008, complied with the terms of the Letter of Credit, and that TriMet is entitled to draw $3 million on the Letter of Credit.

### A.  Existence of a Relevant Agency Relationship

"[A]n agent is one who has authority to act for another in contractual dealings with third persons." *Taylor v. Werner Enters., Inc.*, 329 Or. 461, 468 (1999), *citing Barnes v. Eastern & Western Lbr. Co.*, 205 Or. 553, 574 (1955). An agent's authority may be express or implied. *See id.*, *citing Wiggins v. Barrett & Associates, Inc.*, 295 Or. 679, 686 (1983). "However, most actual

Page 10 - OPINION AND ORDER

authority is implied:  a principal implicitly permits the agent to do those things that are

'reasonably necessary' for carrying out the agent's express authority." *Taylor v. Ramsay-Gerding*

*Constr. Co.*, 345 Or. 403, 410 (2008), *quoting Wiggins*, 295 Or. at 686-87.  The "[a]uthority of

an agent to bind a corporation may arise from the course of dealings between the agent and a

third party and the manner in which the agent has been permitted by the board of directors to

transact business." *Real Estate Loan Fund Oreg., Ltd. v. Hevner*, 76 Or. App. 349, 357 (Or. Ct.

App. 1985), *citing Carstens Packing Co. v. Gross*, 131 Or. 580, 584 (1930), *Sherman-Clay Co. v.

Buffum & Pendleton*, 91 Or. 352, 358 (1919).

    The parties vigorously dispute whether Rader or Thompson was, or could have been,

acting as CRM's agent when negotiating the extension of the Letter of Credit with TriMet.

Certain of the underlying facts, however, are wholly undisputed.  It is undisputed, for example,

that Rader and Thompson participated in the negotiation of the extension, and that Scott State did

not, other than by receiving directly from KeyBank and signing the documents effecting the

extension.  It is likewise undisputed that before the extension was negotiated, Thompson advised

Scott State – in response to State's statement that it would be "a disaster" if TriMet were to draw

on the Letter of Credit and his inquiry whether Thompson was "working with Trimet to get

release on the letter of credit" – that he would negotiate the extension.  It is further undisputed

that Rader had negotiated the previous extension of the Letter of Credit, and that Scott State had

not participated in that negotiation other than by signing the documents effecting the extension.

Both Rader and Thompson have provided sworn testimony that they understood themselves to be

negotiating the extension on behalf of Colorado Railcar, and that they never understood

themselves to be negotiating on behalf of CRM, either solely or in addition to Colorado Railcar.

Scott State has provided sworn testimony that he authorized neither Rader nor Thompson to act as CRM's agents.

In arguing that there can have been no agency relationship between CRM and either Rader or Thompson, CRM relies chiefly on my findings that neither Rader nor Thompson had actual or apparent authority to bind CRM to the PMA. *See* Opinion and Order (#84) at 23. However, the fact that neither Rader nor Thompson had actual or apparent authority to bind CRM to the PMA or to any other agreement does not establish that either lacked authority to negotiate an extension to the letter of Credit on CRM's behalf. That is, my prior rulings do not rule out the possibility that Thompson and/or Rader enjoyed an agency whose scope was limited, *e.g.*, to negotiating draft agreements for State's later approval.

CRM further argues that Rader and Thompson cannot have acted as CRM's agents, because they were never expressly authorized to do so and because neither understood himself to be acting on CRM's behalf at any material time. However, the fact that Rader and Thompson were never expressly authorized to negotiate on CRM's behalf establishes only that they lacked actual authority to do so, and leaves open the possibility that they had apparent authority to act as CRM's agents. Moreover, Rader and Thompson's subjective belief that they never acted on CRM's behalf but rather always solely on Colorado Railcar's behalf does not foreclose the possibility of dual agency, with the apparent agency on CRM's behalf having arisen through a combination of Rader or Thompson's actions in negotiating agreements with TriMet and Scott State's subsequent actions in signing those agreements on CRM's behalf without further negotiation.

Nevertheless, although TriMet is correct that the record does not, as CRM argues,

Page 12 - OPINION AND ORDER

foreclose all possibility that Rader or Thompson could have acted as CRM's agents in negotiating the extension of the Letter of Credit, neither does it clearly establish the fact of Rader's or Thompson's agency. Drawing all reasonable inferences in CRM's favor, a trier of fact could reasonably find that the course of conduct among the parties did not give rise to Rader or Thompson's apparent authority to negotiate on behalf of CRM. That is, a trier of fact could reasonably find, *e.g.*, that Rader and Thompson negotiated both extensions of the Letter of Credit solely as agents of Colorado Railcar, and that Scott State agreed to the extensions on CRM's behalf without requiring further negotiation because he believed to do so was in CRM's best interest at the time. Because a reasonable trier of fact could find that neither Rader nor Thompson acted as CRM's agent in negotiating the extension of the Letter of Credit, TriMet is not entitled to summary judgment on an imputed knowledge theory.

**B.    Materiality of PMA to Rader or Thompson's Putative Agency**

CRM further argues that, even if Rader or Thompson were CRM's agents for the limited purpose of negotiating a non-binding agreement to extend the Letter of Credit on CRM's behalf, knowledge of the PMA would not be imputed to CRM because it would not have been within the scope of Rader's or Thompson's putative agency. It is well-established in Oregon that "the knowledge of an agent is imputable only if it is about matters within the agent's authority as agent." *Tri-Met, Inc. v. Odighizuwa*, 112 Or. App. 159, 164 (Or. Ct. App. 1992), *citing Hogan v. Alum. Lock Shingle Corp.*, 214 Or. 218, 228 (1958), *Phillips v. Colfax Company, Inc.*, 195 Or. 285, 300 (1952). However, as CRM has elsewhere vigorously argued, the existence and terms of the PMA were absolutely material to the question whether it was advisable for CRM to agree to the extension of the Letter of Credit. Indeed, CRM's suggestion that the existence and terms of

Page 13 - OPINION AND ORDER

the PMA could have been unrelated to the decision whether or not to agree to the extension directly contradicts the gravamen of the fraud claim itself. CRM's argument that knowledge of the PMA cannot have been imputed to CRM because it was immaterial to any agency that Rader or Thompson might have enjoyed therefore necessarily fails.

### C.    Adverse Interests Exception

Finally, CRM argues that, even if Rader or Thompson's knowledge of the PMA were otherwise imputable to it, it would be inappropriate to charge CRM with Rader or Thompson's knowledge because those parties had interests adverse to CRM's in connection with the extension of the Letter of Credit. As noted above, an agent's knowledge will not be imputed to his principal where "the agent's *relations to the subject matter are so adverse as to practically destroy the relationship*, as when the agent is acting in his own interest and adversely to that of his principal, or is secretly engaged in attempting to accomplish a fraud which would be defeated by a disclosure to his principal." *FDIC*, 328 Or. at 429 (emphasis original). The *FDIC* court made clear that the adverse interests exception was not limited to circumstances involving an agent's intentional misconduct, self-dealing, or fraud. *See id.* The court clarified that, instead, the degree of an agent's adverse interest is to be analyzed narrowly, in connection with the decision the principal would have been called upon to make if it had had knowledge of the facts actually known only to the agent. *See id.*

Here, the "subject matter" to be considered in analyzing the degree of the putative agents' adverse interest is CRM's decision regarding the advisability of extending the Letter of Credit in light of the existence of the PMA. The evidentiary record leaves open factual questions as to whether, in negotiating the extension of the Letter of Credit, Rader and/or Thompson hoped to

facilitate a scenario in which Colorado Railcar would keep its doors open and pay its employees' salaries effectively at CRM's expense, by accepting interim funding from TriMet that, under the terms of the PMA, would be repaid out of the proceeds of the Letter of Credit.  Indeed, although CRM's complaint contains no allegations of fraud against Rader or Thompson, the record does not foreclose the possibility that Rader or Thompson were affirmatively conspiring with TriMet to obtain CRM's consent to the extension of the Letter of Credit by fraud.  Under either of these possibilities, there would, at a minimum, be a question of fact as to whether Rader's or Thompson's interests were so adverse to CRM's as to destroy any agency relationship that might otherwise have been in place.

For the foregoing reasons, drawing all reasonable inferences in CRM's favor a trier of fact could reasonably find that Rader and Thompson's knowledge could not properly be imputed to CRM.  For this reason, also, TriMet is not entitled to summary judgment on an imputed knowledge theory.

## III.    Enforceability of Suretyship Defenses

In the Opinion and Order of September 18, 2009, I found that CRM was a surety, specifically a secondary obligor of certain of Colorado Railcar's obligations under the Contract. *See* Opinion and Order (#84) at 22.  I further found that a defense to CRM's obligations *qua* surety arose as a matter of law when, on January 16, 2008, TriMet and Colorado Railcar materially increased CRM's surety risks by entering into the PMA without notifying CRM or obtaining its consent.  *See id.* at 25.  However, because the parties had not briefed applicable law to the court, I made no determination as to whether CRM's failure to advise TriMet that it intended to utilize its available defense upon learning of the existence and provisions of the PMA

in June 2008 might have vitiated CRM's suretyship defenses, on a theory of waiver, breach of the implied covenant, or implied consent. *See id.*

For the reasons that follow, I find that CRM neither waived its suretyship defenses by silence nor impliedly consented to the PMA, and that CRM did not violate the implied covenant of good faith and fair dealing when it elected not to advise TriMet of the basis for its discharge theory. In consequence, CRM's obligations as secondary obligor of Colorado Railcar's obligations under the Contract were discharged as a matter of law when TriMet and Colorado Railcar materially increased CRM's risks as surety without CRM's consent. CRM is therefore entitled to summary judgment as to TriMet's request for a declaration that CRM was in default under the Contract when TriMet attempted to draw on the Letter of Credit.

### A.    Waiver by Silence

It is undisputed that Scott State had actual knowledge of the existence and provisions of the PMA by not later than June 19, 2008. By not later than July 9, 2008, Scott State was aware that the PMA arguably materially increased CRM's risk as secondary obligor of Colorado Railcar's obligations under the Contract without its consent, and that under applicable suretyship law such material increase could serve as a basis for discharge of CRM's obligations. Indeed, by that date Scott State was already preparing to contest any draw attempt by TriMet, including by advising KeyBank of CRM's intent to seek injunctive relief to enjoin both the draw and any attempt by KeyBank to draw down on the collateral securing the Letter of Credit. *See* Snider Decl. (#89), Exh. 25-28. Scott State expressly requested that KeyBank not advise TriMet of CRM's intention to contest TriMet's right to draw. *See id.*

On June 30, 2008, CRM's investors accepted an approximately $75,000 interest payment

from Colorado Railcar in compensation for their services in permitting their assets to secure the
Letter of Credit, and Scott State made inquiries regarding another interest payment at or around
the time it was due in September 2008. CRM did not advise TriMet of its belief that its
suretyship obligations had been discharged until after TriMet attempted to draw on the Letter of
Credit on October 22, 2008.

TriMet cites case law from the Eighth and Tenth Circuits, and from states outside the
Ninth circuit, holding that "[i]f a surety, with knowledge of the facts sufficiently to discharge it
from liability, does any affirmative act which contemplates the continued existence of that status,
it thereby waives its right to claim that it is discharged." *Jack v. Craighead Rice Milling Co.*, 167
F.2d 96, 100 (8th Cir. 1948); *see also Trinity Universal Ins. Co. v. Gould*, 258 F.2d 883, 886
(10th Cir. 1958) ("Any course of action with knowledge of the breach which can be reasonably
construed to indicate a disposition to continue the suretyship relation works a waiver of the
breach"), *citing Jack*, 167 F.2d at 100. I have located no comparable holding in any Oregon case,
and the parties cite none.

Assuming without deciding that the Oregon courts would follow the same rule of law,
CRM has not taken any affirmative act to indicate a disposition to continue as Colorado's surety.
The interest payment accepted by CRM's investors in June 2008 was paid directly to the
investors by Colorado Railcar, without any intervention by or assistance from CRM. Moreover,
the interest payment was paid pursuant to an agreement among the investors, Colorado Railcar,
and KeyBank, and was intended to compensate the investors for permitting KeyBank to
encumber certain brokerage accounts serving as collateral to secure the Letter of Credit. That is,
Colorado Railcar's obligation to make interest payments to the investors arose out of an

Page 17 - OPINION AND ORDER

agreement that contemplated the existence of CRM's surety obligations, but not out of the suretyship agreement itself. CRM's failure to object to the investors' receipt of interest payments from Colorado Railcar therefore cannot imply CRM's intent to continue serving as secondary obligor of Colorado Railcar's obligations.

In addition, although Oregon law is silent on the matter, it appears to be the overwhelming majority view that CRM's silence regarding its theory of discharge, even after learning of the facts arguably giving rise to discharge, is insufficient to establish waiver of its suretyship defenses. *See, e.g., Trinity Universal*, 258 F.2d at 886 ("While the surety may waive the breach, mere knowledge of the breaching alterations does not amount to requisite consent, nor does knowledgeable silence give consent. [A discharged surety is] under no duty to declare a breach [of the suretyship agreement] even with knowledge of material alterations of the [underlying] contract"); *United States on behalf of Army Athletic Asso. v. Reliance Ins. Co.*, 799 F.2d 1382, 1387 (9th Cir. 1986) (rejecting the argument that a surety's silence with knowledge of facts giving rise to discharge of the surety's obligations constitutes waiver of the surety's right to discharge) (applying federal common law); *Bank of Nova Scotia v. St. Croix Drive-In Theatre, Inc.*, 728 F.2d 177, 182 (3d Cir. 1984) ("silence by a surety in the face of activity by the principal and creditor is not ordinarily regarded as acceptance or consent to changes in the original arrangements"), *citing* A. Stearns, LAW OF SURETYSHIP, § 6.33 at 159 (1951); *Thompson v. Metro. Bldg. Co.*, 95 Wash. 546, 550 (Wash. 1917) ("mere silence on the part of a surety, when he is informed of a modification of the contract between his principal and the creditor or that a new obligation has been substituted in lieu of the original one, does not imply assent on his part. In order to bind him to the new undertaking it is not sufficient that he passively acquiesce; he

must actively consent to be bound by the terms of the new agreement"). Oregon law is consistent, requiring more than mere silence to give rise to a waiver, even under circumstances giving rise to a duty to speak. *See, e.g., Hohman v. Royce M.*, 128 Or. App. 384, 387 (Or. Ct. App. 1994) ("Although mere silence can be a basis for a claim of estoppel when a legal duty to speak exists, waiver must be manifested in an unequivocal manner"), *citing Waterway Terminals v. P.S. Lord*, 242 Or. 1, 27 (Or. 1965).

Oregon law does not impose any affirmative duty to speak on a discharged surety or on a party who has received a proposed modification to an existing contract. TriMet argues that the covenant of good faith and fair dealing implied into every Oregon contract gave rise to a duty for CRM to advise TriMet of its discharge theory, but "the implied covenant . . . does not vary the substantive terms of the contract or impose obligations inconsistent with the terms of the contract." *Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 662 (Or. Ct. App. 2007), *citing Best v. U.S. National Bank*, 303 Or. 557, 563 (Or. 1987). Where neither the parties' contractual arrangements nor the operation of law imposes an affirmative burden to speak, such a burden cannot be imposed by the implied covenant. Because CRM was under no duty to advise TriMet of its intent to oppose TriMet's attempt to draw on the Letter of Credit on a theory of discharge, its failure to notify TriMet of its belief that its surety obligations had been discharged did not waive its discharge defense.

**B.    Implied Consent**

Oregon law requires circumstances affirmatively giving rise to a duty to speak before acceptance of proposed modifications to a contract may be implied by silence. *See, e.g., Suitter v. Thompson*, 225 Or. 614, 623 (1960), *citing* 12 Am Jur 533-535, Contracts § 40; 17 CJS 375,

Contracts § 41e; *Wiley v. Berg*, 282 Or. 9, 18-19 (Or. 1978). As discussed above, CRM was under no duty to speak when it learned of the existence and provisions of the PMA, and therefore its silence cannot have implied its consent to its terms.

## IV. The PMA Materially Increased CRM's Risk

As noted in my Order of September 18, 2009, "[a] modification materially increases a guarantor's risk when a careful and prudent person undertaking the risk would have regarded the modification as substantially increasing the chances of loss." *Marc Nelson*, 199 Or. App. 73, 82-83 (internal quotation marks, modifications omitted), *quoting Lloyd Corp. v. O'Connor*, 258 Or. 33, 37 (1971). "The risk to the guarantor must be either actually or potentially detrimental." *Id.* at 83, *citing Equitable Savings & Loan v. Jones*, 268 Or. 487, 492 (Or. 1974). "When a modification deprives a guarantor of the remedy to proceed against the principal debtor to protect the guarantor's personal interest, the modification materially increases the guarantor's risk." *Id.*, *citing Marshall-Wells Co. v. Tenney et al.*, 118 Or. 373, 393-395 (Or. 1926).

On reconsideration of my holding that, under the foregoing standard, the PMA materially increased CRM's risk, including new evidence adduced by TriMet to the effect that CRM's risk of loss under the Letter of Credit was total with or without the PMA, I find no reason to disturb my previous conclusion. Although CRM might have faced a likelihood of total loss with or without the PMA under a *ceteris paribus* assumption, its risk under the two conditions was not equal. That is, although it may be true that, at the time that TriMet and Colorado Railcar entered the PMA, if the parties' circumstances did not materially change TriMet was overwhelmingly likely to draw on the Letter of Credit to its full value, it remained possible that the parties' circumstances *would* change. In the event that Colorado Railcar found new sources of funding,

or that its business became significantly more profitable, there was the possibility that CRM's projected liability on the Letter of Credit would be reduced or even eliminated. The effect of the PMA was to increase CRM's risk of a total loss even if, *ceteris non paribus*, Colorado Railcar's business prospects significantly improved. A prudent surety would necessarily have regarded the PMA as decreasing CRM's likelihood of escaping or reducing its liability on the Letter of Credit, and therefore as materially increasing its risk.

## CONCLUSION

For the reasons set forth above, the constructive motion for reconsideration implicit in CRM's Supplemental Memorandum (#86) in Support of Plaintiff's Motion for Summary Judgment is granted in part and denied in part, as follows: CRM's motion (#37) for partial summary judgment is granted as to TriMet's claim for declaratory judgment to the extent TriMet seeks a declaration that CRM was at any material time in default under the Contract only, and is otherwise denied. The constructive and express motions for reconsideration contained in TriMet's Memorandum (#87) Regarding Supplemental Summary Judgment Issues are denied.


Dated this 22nd day of December, 2009.

Paul Papak

Honorable Paul Papak
United States Magistrate Judge