IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CRM COLLATERAL II, INC.,

          Plaintiff,

                                              CV 08-1266-PK (LEAD)

                                              OPINION AND

v.                                            ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

          Defendant.

MARK GUETZKO, LISA GUETZKO,
RICHARD ALTORFER, SEEDORFF
MASONRY, INC., DALE KARTMAN,
SUSAN KARTMAN, and SEEDORFF
PARTNERSHIP, LLP,

          Plaintiffs,

                                              CV 09-1135-PK

v.

CRM COLLATERAL II, INC.,

          Intervenor Plaintiff,

Page 1 - OPINION AND ORDER

v.

KEYBANK NATIONAL ASSOC.,

       Defendant,

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON,

       Intervenor Defendant.

_____

PAPAK, Magistrate Judge:

Plaintiff CRM Collateral II, Inc. ("CRM"), and Richard Altorfer filed the lead case in this

consolidated action against Tri-County Metropolitan Transportation District of Oregon

("TriMet") and KeyBank National Association ("KeyBank") on October 27, 2008.  The parties'

dispute arose out of Tri-Met's efforts to draw on a letter of credit as to which it was the

beneficiary, KeyBank was the issuer, and CRM was the applicant.  On November 4, 2008,

Altorfer was voluntarily dismissed as a plaintiff.  On November 10, 2008, TriMet filed a

counterclaim for declaratory relief.  CRM voluntarily dismissed KeyBank as a party to the action

on January 20, 2009.  On September 18, 2009, the court denied the remaining parties'

cross-motions for summary judgment, but invited supplemental briefing as to specified legal

issues not addressed in the record then before the court.

On October 22, 2009, the lead case was consolidated with *Guetzko v. KeyBank*, Case No.

CV-09-1135-PK.  At the time the cases were consolidated, KeyBank was subject to an injunction

Page 2 - OPINION AND ORDER

enjoining it from honoring TriMet's requests to draw on the letter of credit.  On November 13, 2009, this court dissolved that injunction.  The *Guetzko* plaintiffs' moved for reconsideration, and on November 30, 2009, the motion was denied.  Immediately thereafter, TriMet successfully drew on the letter of credit in the amount of $3 million, the maximum amount available.

On December 22, 2009, the court determined that the surety defense of discharge was available to CRM, and on that basis disposed of TriMet's claims to be entitled as a matter of law to retain the proceeds from its draw.

On February 5, 2010, KeyBank filed a counterclaim against CRM, seeking reimbursement for the funds it paid out to TriMet.  On February 16, 2010, CRM filed crossclaims against TriMet in the *Guetzko* action, for unjust enrichment, money had and received, breach of contract, breach of statutory warranty for falsely certifying CRM's default, and breach of statutory warranty premised on material fraud.  On February 26, 2010, KeyBank filed a crossclaim against TriMet, to be considered in the alternative to its counterclaim against CRM, seeking repayment of the moneys paid out to TriMet.

Now before the court are KeyBank's (#110) for summary judgment as to its crossclaim against TriMet, TriMet's motion (#115) styled as a motion for summary judgment, but properly construed in part as a motion for reconsideration and only in part as a motion for summary judgment, and CRM's motion (#118) for summary judgment.  I have heard oral argument on behalf of the parties, and have considered the motions and all of the pleadings on file.  For the reasons set forth below, KeyBank's motion is denied, TriMet's motion is granted in part and denied in part as discussed below, and CRM's motion is granted in part and denied in part as discussed below.

Page 3 - OPINION AND ORDER

## LEGAL STANDARDS

**I.      Cross-Motions for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also*, *e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## II.      Motion for Reconsideration

It is appropriate to alter or amend a judgment under Federal Civil Procedure Rule 59(e) if "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 780 (9th Cir. 2009), *quoting Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001).

## FACTUAL BACKGROUND

## I.      Facts Underlying the Parties' Dispute

In November 2005, TriMet entered into Contract No. RH030433LE (the "Contract") with third party Colorado Railcar Manufacturing, LLC ("Colorado Railcar"), pursuant to which Colorado Railcar would manufacture and TriMet would purchase three railcars and one trailer. TriMet's price for the railcars and trailers was initially fixed at $17,821,806, but was subsequently reduced, first to $17,481,135 and later to $17,299,135.  The Contract required Colorado Railcar to maintain an irrevocable standby letter of credit in the amount of $3 million continuously from the time it issued notification that manufacture would begin to the final delivery of railcars and trailers to TriMet.

CRM was incorporated November 13, 2006, for the purpose, among other potential legal purposes, of maintaining a letter of credit in the amount of $3 million as Colorado Railcar was required to do under the Contract.  Colorado Railcar's CEO, Thomas Rader, is one of CRM's two corporate directors, and Colorado Railcar's CFO, John Thompson, was CRM's registered agent at the time CRM was incorporated.  CRM's second corporate director and its sole corporate officer

(both its President and its Treasurer) was Scott State,[1] who worked with Colorado Railcar as a consultant from 2004 through 2007.

On November 17, 2006, CRM obtained the Letter of Credit from KeyBank.  The Letter of Credit identified CRM as the "applicant" and TriMet as the "beneficiary."  The terms of the Letter of Credit required TriMet to certify in writing that CRM was in default under the Contract – although CRM was not at that time a party to the Contract – in order to draw on the letter as its beneficiary.  As originally issued, the expiration date of the Letter of Credit was November 15, 2007.

Simultaneously with obtaining the Letter of Credit, CRM entered into a Letter of Credit Reimbursement Agreement (the "reimbursement agreement") with KeyBank, the terms of which required CRM to reimburse KeyBank in the amount of any payment KeyBank made to TriMet under the Letter of Credit, plus interests, charges, and expenses.  On that same day, November 17, 2006, Colorado Railcar, CRM, and the *Guetzko* plaintiffs entered into an Investment Agreement whereby Colorado Railcar agreed to pay the *Guetzko* plaintiffs a fee in exchange for their promise to provide collateral to secure CRM's obligation to reimburse KeyBank in the event TriMet drew on the Letter of Credit.

In April 2007, TriMet learned for the first time that CRM, rather than Colorado Railcar, was the applicant on the Letter of Credit.  Effective April 20, 2007, TriMet, Colorado Railcar, and CRM agreed to a written modification of the Contract (Modification No. 1), pursuant to which CRM became a party to the Contract for the sole purpose of making a default by Colorado Railcar under the Contract constitute a default by CRM for purposes of the Letter of Credit.

---

[1]  Former defendant Jeffrey State is Scott State's brother.

Rader represented CRM in the negotiation of Modification No. 1, and State signed Modification No. 1 on CRM's behalf.  In addition, in connection with Modification No. 1 CRM supplied to TriMet certain organizational resolutions issued by CRM's board of directors providing that only officers of the corporation – namely, Scott State and no other person – were authorized to enter into or negotiate any agreements on CRM's behalf.

In October 2007, the parties agreed to extend the Letter of Credit's expiration date from November 15, 2007, to May 15, 2008.  Rader and Thompson participated in the extension negotiations, and Scott State did not, although he ultimately signed the amendment that effected the extension.

On January 16, 2008, TriMet and Colorado Railcar entered into a Project Monitoring Agreement (the "PMA") that modified their rights and obligations under the Contract.  CRM was not a party to the PMA, nor was CRM directly advised that the PMA had been executed – that is, Scott State was not advised, although Rader was necessarily aware of the PMA in consequence of his status as Colorado Railcar's CEO.  The PMA modified the relationship between Colorado Railcar and TriMet, in relevant part, as follows:  under the PMA, TriMet would make "special contract payments" to or on behalf of Colorado Railcar, including payments not provided for under the Contract; TriMet was authorized to fund these special payments by drawing on the Letter of Credit; such special payments, if neither earned under the Contract nor repaid by Colorado Railcar, would become "damages" under the Contract; and TriMet was authorized to compensate itself for any such special payments that Colorado Railcar failed to repay by drawing on the Letter of Credit.  In addition, under the PMA a "financial monitor" was appointed to oversee Colorado Railcar's operations, and TriMet was given authority to approve or disapprove

of Colorado Railcar's budgets and expenditures.

The PMA was modified on February 21, 2008, primarily to add Alaska Railroad Corporation as an additional party. CRM was not a party to the amended PMA, nor was the amended PMA disclosed directly to CRM.

In April 2008, the parties agreed to a second extension of the expiration date of the letter of Credit, from May 15, 2008, to November 15, 2008. Rader and Thompson were involved in the negotiation of the extension and Scott State was not, although he signed the amendment that effected the extension. No party informed Scott State of the existence of the PMA or amended PMA prior to CRM's consent to the extension.

In June 2008, Thompson advised Scott State of the existence of the amended PMA. Scott State requested that Thompson send him a copy of the amended PMA, and Thompson did so. State read the amended PMA at that time and understood, at a minimum, that it "purported to give TriMet the right to call on the [L]etter of [C]redit to compensate [itself] for special contract payments under the PMA." Scott State did not contact TriMet to discuss the amended PMA or its impact on CRM's obligations under the Letter of Credit at that time, but rather discussed the matter with KeyBank and hired an attorney to represent him and/or CRM.

In or around September or October 2008, Colorado Railcar completed the manufacture and delivery of the railcars and trailer, and shortly thereafter ceased operations. Prior to the completion date, TriMet made more than $5.5 million in special contract payments to Colorado Railcar under the auspices of the PMA and amended PMA. On October 22, 2008, TriMet attempted to draw on the Letter of Credit to reimburse itself for $3 million of those special contract payments. This action followed.

Page 8 - OPINION AND ORDER

## II.    Material Procedural History

On October 27, 2008, CRM and Richard Altorfer[2] filed the *CRM v. TriMet* action,
simultaneously moving for a temporary restraining order to enjoin KeyBank from honoring
TriMet's draw request.  Judge King granted the *CRM* plaintiffs' motion, and set a preliminary
injunction hearing for November 7, 2008.  On November 5, 2008, plaintiffs filed the *Guetzko v.
KeyBank* action against KeyBank, Raymond James Financial Services, and Jeffrey State in the
state court for Clayton County, Iowa, likewise moving to enjoin TriMet's draw request.  On
November 7, 2008, the Iowa court granted plaintiffs' motion, and issued an Iowan temporary
injunction (the "Injunction") enjoining KeyBank from honoring TriMet's draw request of October
22, 2008.  In consequence, the preliminary injunction hearing set in the *CRM v. TriMet* action did
not take place and the TRO entered by Judge King was permitted to lapse.

On November 12, 2008, KeyBank removed the Clayton County action to the federal
Northern District of Iowa, and on November 14, 2008, TriMet moved to intervene on an
expedited basis.   Also on November 14, 2008, TriMet attempted to file a motion to dissolve the
Injunction, but its filing was not accepted until December 4, 2008, the date the court for the
Northern District of Iowa granted TriMet's motion to intervene.

On January 22, 2009, CRM also moved to intervene in the Iowa action.  On February 25,
2009, its motion was granted.

On September 18, 2009, in the *CRM v. TriMet* action, this court denied both CRM's
motion for partial summary judgment and TriMet's cross-motion for summary judgment. Four

---

[2]  Altorfer was voluntarily dismissed as a plaintiff to the *CRM v. TriMet* action on
November 4, 2008.

days later, on September 22, 2009, the Iowa action was transferred to this court, no ruling having

yet been entered on TriMet's motion to dissolve the Injunction.  TriMet renewed its motion to

dissolve in this court on October 5, 2009.

On October 22, 2009, the two actions were consolidated.  *CRM v. TriMet* was designated

as the lead case and *Guetzko v. KeyBank* was designated as a member case in the consolidated

action.

On November 13, 2009, this court dissolved the Injunction enjoining KeyBank from

honoring TriMet's draw request.  On November 17, 2009, the *Guetzko* plaintiffs moved for

reconsideration of the decision to dissolve the Injunction.  This court denied the request for

reconsideration by minute order on November 18, 2009.  TriMet subsequently drew $3 million

on the Letter of Credit.  Although TriMet's draw clearly triggered both a statutory and a

contractual obligation for CRM to reimburse KeyBank for its payment to TriMet, CRM has not

reimbursed KeyBank to date.

On December 22, 2009, the court granted CRM's supplemental motion for summary

judgment as to TriMet's claim for declaratory judgment that CRM had, at material times, been in

default on the Contract, otherwise denied CRM's supplemental motion for summary judgment,

and denied TriMet's supplemental motion for summary judgment.

On February 5, 2010, KeyBank filed a counterclaim against CRM, alleging breach of the

reimbursement agreement between them, and seeking as damages $3 million plus interest and

various charges and other expenses, including a late charge in the amount of 5% of TriMet's

draw, or $150,000.

On February 16, 2010, CRM filed new crossclaims against TriMet in the *Guetzko v.*

Page 10 - OPINION AND ORDER

*TriMet* action. CRM alleged crossclaims for unjust enrichment, money had and received, breach of contract, and two claims for breach of statutory warranty, one for certifying to KeyBank that CRM was in default under the Contract and one for material fraud in connection with TriMet's draw request.

On February 26, 2010, KeyBank filed a crossclaim against TriMet, alleging TriMet's unjust enrichment and seeking $3 million in damages plus interest and expenses, on the theory that TriMet's certification that CRM was in default under the Contract had been false when made, purportedly rendering TriMet's draw improper.

On March 19, 2010, KeyBank moved for summary judgment against CRM on its counterclaim and against TriMet on its crossclaim, CRM moved for summary judgment, and TriMet moved for summary judgment. In its opposition to KeyBank's motion against it, CRM advised the court that KeyBank would be withdrawing its motion for judgment on its counterclaim, and on May 4, 2010, KeyBank's counsel confirmed to the court that the motion would be withdrawn.

At oral argument on the remaining three dispositive motions, counsel for CRM and KeyBank advised the court that those two parties had reached a settlement in principal of KeyBank's counterclaim against CRM. On May 11, 2010, counsel for CRM provided to the court a copy of a settlement agreement entered into as of April 8, 2010, by CRM and KeyBank, pursuant to which KeyBank agreed to withdraw its motion for summary judgment as to its counterclaim against CRM, and the parties agreed to settle their dispute by consent judgment. According to the terms of the consent judgment, KeyBank would be awarded as damages from CRM $3,000,000 plus interest at KeyBank's "Prime Rate" plus 5%, plus $7,520. The settlement

Page 11 - OPINION AND ORDER

agreement provides that CRM's counsel will file a motion for entry of the consent judgment on

the earlier of the date of this court's ruling on CRM's pending motion for summary judgment or

August 1, 2010.

## ANALYSIS

## I.    KeyBank's Motion for Summary Judgment as to its Crossclaim Against TriMet

KeyBank's crossclaim against TriMet states a claim for unjust enrichment on the theory

that TriMet's draw request was necessarily invalid when made because CRM was not at that time

in default under the Contract, despite TriMet's certification to the contrary.  KeyBank's argument

is that it should never have been required to honor TriMet's draw request, and that therefore

TriMet has been unjustly enriched in the amount of the proceeds from that request.

Under Oregon law, the elements of a claim for unjust enrichment "are a benefit conferred,

awareness by the recipient that a benefit has been received and, under the circumstances, [that] it

would be unjust to allow retention of the benefit without requiring the recipient to pay for it."

*Edward D. Jones & Co. v. Mishler*, 161 Or. App. 544 (1999) (internal quotation marks omitted),

*quoting Jaqua v. Nike, Inc.*, 125 Or. App. 294, 298 (1993).  The Oregon courts have held that it

is unjust to allow retention of such a benefit when at least one of the following is true:

(1) the plaintiff had a reasonable expectation of payment;

(2) the defendant should reasonably have expected to pay; or

(3) society's reasonable expectations of security of person and property would be
defeated by non-payment.

*Jaqua*, 125 Or. App. at 298, *quoting* 1 Corbin, Contracts § 19A.

Here, it is undisputed that TriMet has received a benefit, namely the proceeds from its

draw on the Letter of Credit, and that TriMet is aware of its receipt of same.  However,

Page 12 - OPINION AND ORDER

KeyBank's suggestion that it would be unjust for TriMet to retain the benefit runs afoul of the

undisputed fact that KeyBank has an available contractual and statutory remedy against CRM for

reimbursement of its payment to TriMet.  Under these circumstances, KeyBank has no

reasonable expectation of payment *from TriMet*, nor, under the so-called "independence

principle" (discussed in detail in Section II(A)(2) below), should TriMet have reasonably

expected to pay back the proceeds of its draw *to KeyBank*.   For these same reasons, societal

expectations of security of person and property would not be impacted by TriMet's failure to

return the proceeds from the Letter of Credit to its issuer.  Indeed, where KeyBank has a clear

and enforceable remedy against CRM, it would constitute a clear injustice to require TriMet to

fulfill CRM's contractual and statutory obligations.  *See*, *e.g.*, *ABB Daimler-Benz Transp. v.

AMTRAK*, 14 F. Supp. 2d 75, 92 (D.D.C. 1998) (no cause of action for unjust enrichment against

the recipient of a benefit where the benefit is provided pursuant to a contract and the contracting

party with the obligation to pay for the benefit fails to perform under the contract).  Because

KeyBank cannot show that it would be an injustice to permit TriMet to retain the proceeds from

its draw, KeyBank is not entitled to summary judgment on its crossclaim.  Its motion is therefore

denied.

        Moreover, KeyBank expressly couches its argument to be entitled to reimbursement from

TriMet in the alternative to its argument that it is entitled to reimbursement from CRM.  That is,

KeyBank argues that it is entitled to reimbursement from TriMet only in the event that CRM is

not ordered to comply with its statutory and contractual reimbursement obligation.  Because

CRM has not been relieved of its clear statutory and contractual obligation to reimburse

KeyBank, KeyBank's unjust enrichment claim against TriMet does not present this court with a

Page 13 - OPINION AND ORDER

justiciable controversy that it is authorized to resolve.  *See*, *e.g.*, *Preiser v. Newkirk*, 422, U.S. 395, 401 (1975).  The absence of a justiciable controversy provides alternative and independently sufficient ground to support the conclusion that KeyBank's summary judgment motion should be denied.

**II.    TriMet's Motion**

As noted above, TriMet's motion, although styled  as a motion for summary judgment, is in fact organized and argued in large part as a motion for reconsideration of my prior rulings in this action, and only in part as a motion for summary adjudication of issues now pending before the court.  I therefore address TriMet's arguments in support of reconsideration and its arguments in favor of summary judgment separately.

**A.    TriMet's Motion to the Extent Construed as a Motion for Reconsideration**

TriMet renews its now several-times repeated arguments that I erred in my conclusions that CRM acted as a surety with respect to Colorado Railcar's obligations to TriMet under the Contract, that suretyship defenses can be available in connection with transactions involving letters of credit, and that, even on the *arguendo* assumption that suretyship defenses may be available in letter of credit transactions, CRM is able to assert the suretyship defense of discharge on the facts in this record.  In addition, TriMet argues that I erred in failing to grant summary judgment in TriMet's favor on CRM's claim for common-law fraud.  I address each of its arguments in turn.

**1.    CRM *qua* Surety**

To the extent it seeks reconsideration of my prior rulings, TriMet relies heavily on straw man argumentation.  That is, TriMet repeatedly substitutes for my own conclusions propositions

bearing little relation to my actual holdings and reasoning, and then critiques the substituted propositions rather than the legal analyses actually at issue in my opinions. TriMet's argument that I erred in concluding that CRM was a surety constitutes perhaps the clearest example of TriMet's straw man approach.

TriMet characterizes my holding as tantamount to establishing the rule that all four-party letter of credit transactions necessarily create sureties. TriMet further characterizes my holding as resting on the premise that CRM's status as applicant on the Letter of Credit was sufficient to create a suretyship. Both characterizations are inaccurate. It is the particular relationship among CRM, TriMet, and Colorado Railcar, as memorialized in Modification No. 1 to the Contract, that underlies my conclusion that CRM acted as a surety of Colorado Railcar's obligations to TriMet, rather than CRM's status as applicant on the Letter of Credit or the number of parties to the transaction.

As I stated in my Opinion and Order (08-1266: #84) dated September 18, 2009:

A suretyship, or guaranty, is the relationship that obtains among the parties when an obligee (or creditor) has recourse against a person (the surety or guarantor) or that person's property with respect to an obligation owed by an obligor (or principal) to the obligee. A suretyship creates rights and obligations among the parties independently of any express contractual agreement among the parties, although the rights and obligations that arise out of the relationship may be modified by contractual agreement.

The Oregon courts look to the substance of the parties' relationship rather than to the terms used in any contractual agreements among the parties to determine whether a suretyship exists. *See, e.g., Ochoco Lumber Co. v. Fibrex & Shipping Co.*, 164 Or. App. 769, 777 (2000) (citations omitted) (finding, *inter alia*, that in consequence of "the general practice on standby letters of credit--that the issuer's obligation to pay on the letter of credit only arises if there is a default" by the principal – the existence of a standby letter of credit supports the inference that the applicant on the letter of credit is a "*de facto* surety"); *see also, e.g., Marshall-Wells Co. v. Tenney*, 118 Or. 373, 383 (1926) (noting that letters of credit should be interpreted not strictly or technically, but rather in light of the

Page 15 - OPINION AND ORDER

parties' intentions in entering into them).  Thus, under Oregon law a suretyship (or guaranty) exists wherever a person agrees to answer or be responsible for the debt or obligation of another.  *See*, *e.g.*, *Chada v. Tapp*, 277 Or. 3, 6-7 (1977).

There can be no serious dispute that, pursuant to the plain language of Modification No. 1 and of the Letter of Credit, TriMet had recourse against CRM with respect to a maximum of $3 million owed by Colorado Railcar to TriMet.  Under Oregon law, the conclusion that a suretyship was created by the parties' agreements seems clear.

TriMet suggests that so to hold is the equivalent of holding that the Letter of Credit itself constitutes a surety agreement, and points to case law standing for the proposition that letters of credit are not identical with guarantees.  I find no support for TriMet's suggestion in the evidentiary record or in the language of my prior holdings.  Here, the Letter of Credit constituted the *mechanism* by which the parties agreed TriMet's recourse against CRM would be effected in the event that Colorado Railcar defaulted in its obligations to TriMet.  It was not the suretyship itself, but rather was an instrument intended by the parties to augment the suretyship arrangement memorialized in Modification No. 1.

TriMet further offers the argument that Modification No. 1 could not have created a suretyship relationship, because it was intended only to correct an error in the Letter of Credit (specifically, that it named CRM as the applicant despite the fact that the Contract, as originally drafted, expressly specified that Colorado Railcar was to serve as the applicant).  It is understandable that TriMet and its counsel may wish that this were so, but the undisputed facts unambiguously belie TriMet's position.

As I noted in my Opinion and Order (08-1266: #84) dated September 18, 2009, "it is reasonably clear that at the time TriMet and Colorado Railcar entered into the Contract, [the

parties] did not intend for any third party to undertake Colorado River's obligation to provide a letter of credit. . . ."  When belatedly confronted with the fact that the applicant on the Letter of Credit was CRM rather than Colorado Railcar, it is undisputed that TriMet had available to it the option of requiring Colorado Railcar to comply with its contractual obligations by obtaining a letter of credit in its own name.  Had TriMet elected to hold Colorado Railcar to its contractual obligations rather than choosing to modify the obligations themselves, so doing could reasonably have been characterized as mere "correction of an error."  Instead, however, TriMet expressly elected to modify the terms of the Contract to provide that CRM would serve as a secondary obligor of Colorado Railcar's contractual obligations.  While TriMet's election to modify the Contract rather than to require compliance with the Contract as drafted had significant consequences not contemplated at the time TriMet and Colorado Railcar initially entered into their agreement, that fact is not pertinent to the analysis of the legal relations obtaining among the parties following execution of Modification No. 1.

Because TriMet elected to modify the terms of the Contract to provide that CRM would serve as secondary obligor of Colorado Railcar's obligations under the Contract rather than to enforce the terms of the Contract as originally drafted, a suretyship was created as a matter of Oregon law.  On reconsideration, I therefore find no reason to disturb my prior ruling that CRM served as surety to Colorado Railcar's contractual obligations to TriMet.

### 2.    Suretyship Defenses in Letter of Credit Transactions

As I stated in my Opinion and Order (08-1266:  #84) dated September 18, 2009:

> A letter of credit is an instrument by which a bank (the issuer) agrees to make a payment to or to the order of a person (the beneficiary) on terms or conditions specified by a customer of the bank (the applicant).  The historical *raison d'être* of the letter of credit was to provide the parties to transactions of significant value

with reasonable certainty that an undertaking to pay would be honored, regardless of the creditworthiness of the payor.  In keeping with that rationale, Oregon's codification of the Uniform Commercial Code provides that "[r]ights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary." O.R.S. 74.1030(4).  This so-called "independence principle" may not be modified or varied by agreement among the parties to a letter of credit.  *See* O.R.S. 75.1030(3).  Thus, issuers of letters of credit must honor facially proper draws on letters of credit by beneficiaries, without regard to the rights or obligations obtaining between the applicant and the beneficiary of the letter of credit.  *See, e.g., Western Sur. Co. v. Bank of S. Or.*, 257 F.3d 933, 936 (9th Cir. 2001) (applying Oregon law), *citing Andy Marine, Inc. v. Zidell Inc.*, 812 F.2d 534, 537 (9th Cir. 1987).

In opposition to CRM's claims in the lead case of this consolidated action, TriMet was a vehement proponent of the independence principle, arguing strenuously in favor of the proposition that its rights under the Letter of Credit were wholly independent of the parties' broader contractual and legal relationships.[3]  In support of its request for reconsideration, however, TriMet adopts the wholly inconsistent position that the law governing letters of credit necessarily governs the parties' broader contractual and legal relationships as well.

TriMet's position finds no support in applicable law.  Indeed, the Ninth Circuit has expressly rejected the argument that UCC provisions governing a beneficiary's right to draw on a letter of credit may be employed to prevent an action by an applicant against a beneficiary for return of drawn proceeds based on their underlying contractual relationship.  *See First Ave. West Bldg., LLC v. James (In re Onecast Media)*, 439 F.3d 558, 564 (9th Cir. 2006) ("It is one thing to attempt to prevent the distribution of the proceeds of a letter of credit, an attempt the doctrine of

---

[3]  Indeed, it is the operation of the independence principle that led to my dissolution of the Injunction and permitted TriMet to draw on the Letter of Credit despite CRM's claim to have enjoyed valid suretyship defenses.

Page 18 - OPINION AND ORDER

independence is designed to prevent; but it is quite another to bring an action on the underlying

contract that created the letter of credit," *quoting In re Graham Square, Inc.*, 126 F.3d 823, 828

(6th Cir. 1997); "[t]he fact that Debtor seeks the return of funds that are proceeds of a letter of

credit does not negate the breach of contract claim on the underlying obligation," *quoting In re*

*Papio Keno Club, Inc.*, 247 B.R. 453, 460 (B.A.P. 8th Cir. 2000)); *see also* U.C.C. § 5-103, cmt

2.

Under the independence principle, a beneficiary's right to draw on a letter of credit is

analyzed without regard to contractual or legal obligations outside the four corners of the letter,

and the underlying relations of the parties are not impacted by the rules governing the

enforceability of the letter of credit.  On reconsideration, I therefore find no reason to disturb my

prior ruling that suretyship defenses are available to sureties even in transactions involving letters

of credit.

### 3.    Discharge of Surety Obligations

TriMet argues that I erred in concluding that the PMA materially increased CRM's risk as

surety, that TriMet had failed to establish as a matter of law that CRM had consented to the

PMA, and that CRM had not waived its suretyship defenses despite purportedly "facilitating"

interest payments to its investors following the date Scott State learned of the PMA's existence.

On grounds of each of these assignments of error, TriMet concludes that I erred in holding that

CRM's suretyship obligations have been discharged by operation of law.

### a.    Increased Risk

As noted in my Opinion and Order (08-1266:  #84) dated September 18, 2009:

Oregon law provides that a surety is discharged of its obligations when, without
the surety's consent, the principal and creditor materially alter the terms of their

relationship. *See*, *e.g.*, *Marc Nelson Oil Prods. v. Grim Logging Co.*, 199 Or. App. 73, 79 (2005) (modified on other grounds), *citing Equitable Savings & Loan v. Jones*, 268 Or. 487, 491, 492 (1974); *see also*, *e.g.*, *Lloyd Corp. v. O'Connor*, 258 Or. 33, 38 (1971); *Marshall-Wells*, 118 Or. at 385. Where, as here, the surety is compensated rather than gratuitous, the material alteration of the principal/creditor relationship must, in addition, increase the risk to the surety or otherwise be actually or potentially detrimental to the surety. *See*, *e.g.*, *Marc Nelson Oil*, 199 Or. App. at 79, *citing Equitable Savings & Loan*, 268 Or. at 491-92; *see also*, *e.g.*, *Lloyd*, 258 Or. at 38; *Marshall-Wells*, 118 Or. at 385.

* * *

"A modification materially increases a guarantor's risk when a careful and prudent person undertaking the risk would have regarded the modification as substantially increasing the chances of loss." *Marc Nelson*, 199 Or. App. 73, 82-83 (internal quotation marks, modifications omitted), *quoting Lloyd*, 258 Or. at 37. "The risk to the guarantor must be either actually or potentially detrimental." *Id.* at 83, *citing Equitable Savings & Loan*, 268 Or. at 492. "When a modification deprives a guarantor of the remedy to proceed against the principal debtor to protect the guarantor's personal interest, the modification materially increases the guarantor's risk." *Id.*, *citing Marshall-Wells*, 118 Or. at 393-95.

TriMet argues that I erred in concluding that the PMA, which TriMet and Colorado Railcar entered into without notice to or consent from CRM, materially increased CRM's risk as surety, thereby discharging CRM's suretyship obligations. In my Opinion and Order (08-1266: #84) dated September 18, 2009, I analyzed the effect of the PMA as follows:

The PMA provided, *inter alia*, that TriMet would make "special contract payments" to or on behalf of Colorado Railcar, including payments not provided for under the Contract; TriMet was authorized to fund these special payments by drawing on the Letter of Credit; such special payments, if neither earned under the Contract nor repaid by Colorado Railcar, would become "damages" under the Contract; and TriMet was authorized to compensate itself for such special payments that Colorado Railcar failed to repay by drawing on the Letter of Credit. The net effect of the PMA was to increase the likelihood that when TriMet drew on the Letter of Credit it would be for the maximum amount, and to decrease the likelihood that, at the time the draw was made, Colorado Railcar would have resources remaining with which to reimburse CRM for its liability to KeyBank following TriMet's draw. The PMA therefore materially increased CRM's risk as surety as a matter of law.

Page 20 - OPINION AND ORDER

Evidence newly adduced by the parties only serves to reinforce my earlier conclusion.  In particular, Rader has provided sworn written testimony, undisputed by any evidence offered by TriMet, that the PMA "put Colorado Railcar in a worse position to attract new capital or new contracts."  On reconsideration, I find no reason to disturb my prior ruling that CRM's obligations as surety were discharged when TriMet and Colorado Railcar executed the PMA.

### b.    Consent

In my Opinion and Order (08-1266:  #84) dated September 18, 2009, I analyzed TriMet's argument that CRM consented to the PMA as follows:

> Although it is undisputed that State was the only person with actual authority to bind CRM to the PMA and that State did not consent to the PMA – and did not have actual knowledge of its existence prior to June 2008 – TriMet argues that CRM is estopped from denying its consent to the PMA because Rader, who undisputedly had knowledge of the PMA, had apparent authority to act for CRM. TriMet's apparent authority argument fails for at least three reasons.  First, no person ever purported to consent to the PMA on behalf of CRM, in that Rader's consent to the PMA was on behalf of Colorado Railcar, so it is immaterial whether Rader had authority to bind CRM.  Second, TriMet had actual knowledge that State was the only person with actual authority to bind CRM to any agreement, and, under Oregon law, "it is well established that one cannot rely upon an agent's apparent authority when he knows that the agent does not have actual authority or had knowledge of facts which would put him on inquiry as to the actual authority of the agent."  *Minniti v. Cascade Employers Asso.*, 280 Or. 319, 329 (1977), *citing Portland v. American Surety Co.*, 79 Or. 38, 43-44 (1915). Third, all of the evidence TriMet puts forward as operating to "cloak" Rader with apparent authority to bind CRM arises out of Rader's own conduct, and as a matter of law apparent authority cannot arise out of an agent's conduct, but rather must arise out of the conduct of the agent's principal.  *See*, *e.g.*, *Taylor v. Ramsay-Gerding Constr. Co.*, 345 Or. 403, 410 (2008) ("An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal").  Rader's consent to the PMA cannot, as a matter of law, have bound CRM.

Subsequently, in my Option and Order (08-1266:  #98) dated December 22, 2009, I began to analyze TriMet's argument that CRM constructively consented to the PMA as follows:

Page 21 - OPINION AND ORDER

It is well settled in Oregon that "[a]n agent's knowledge acquired within the scope
of the agency is imputed to the principal, regardless of whether the agent actually
communicates that knowledge to the principal." *Benson v. State*, 196 Or. App.
211, 217 (2004), *citing Hogan v. Alum. Lock Shingle Corp*, 214 Or. 218, 228
(1958). However, the Oregon courts further recognize an "adverse interest"
exception to that general rule, whereby a principal is not charged with its agent's
knowledge if "the agent's *relations to the subject matter are so adverse as to
practically destroy the relationship*, as when the agent is acting in his own interest
and adversely to that of his principal, or is secretly engaged in attempting to
accomplish a fraud which would be defeated by a disclosure to his principal."
*FDIC v. Smith*, 328 Or. 420, 429 (1999) (emphasis original), *quoting Saratoga
Inv. Co. v. Kern*, 76 Or. 243, 254 (1915).

Following further analysis, I concluded that Rader and/or Thompson could have acted as CRM's

agents in negotiating the extension of the PMA, because although TriMet had actual knowledge

that only Scott State had actual authority to consent to such extension, the absence of actual

authority to consent to the extension did not preclude Rader or Thompson from enjoying

authority to negotiate its terms.[4]  I then analyzed the adverse interests exception to the general

rule that an agent's knowledge acquired within the scope of the agency is imputed to the principal

as follows:

As noted above, an agent's knowledge will not be imputed to his principal where
"the agent's *relations to the subject matter are so adverse as to practically destroy
the relationship*, as when the agent is acting in his own interest and adversely to

_____

[4]  CRM argues that I erred in so concluding, on the ground that the same organizational
resolutions that were the basis of TriMet's knowledge that only Scott State had actual authority to
*enter into* agreements on CRM's behalf also provided that only Scott State had authority to
*negotiate* agreements on CRM's behalf.  On reconsideration, I find no reason to disturb my
previous conclusion that Rader and/or Thompson could have had apparent authority to negotiate
such agreements, based on the fact that following the October 2007 negotiation of the first
extension of the Letter of Credit's deadline, from November 15, 2007, to May 15, 2008, at which
Rader and Thompson participated in the negotiations and Scott State did not, Scott State did not
repudiate Rader's and Thompson's actions or require further negotiations, but rather bound CRM
to the extension agreement.  While an agent's conduct cannot cloak the agent with apparent
authority to act on the principal's behalf, the principal's conduct can do so.  *See Taylor v.
Ramsay-Gerding Constr. Co.*, 345 Or. 403, 410 (2008).

Page 22 - OPINION AND ORDER

that of his principal, or is secretly engaged in attempting to accomplish a fraud which would be defeated by a disclosure to his principal." *FDIC*, 328 Or. at 429 (emphasis original). The *FDIC* court made clear that the adverse interests exception was not limited to circumstances involving an agent's intentional misconduct, self-dealing, or fraud. *See id.* The court clarified that, instead, the degree of an agent's adverse interest is to be analyzed narrowly, in connection with the decision the principal would have been called upon to make if it had had knowledge of the facts actually known only to the agent. *See id.*

Here, the "subject matter" to be considered in analyzing the degree of the putative agents' adverse interest is CRM's decision regarding the advisability of extending the Letter of Credit in light of the existence of the PMA. The evidentiary record leaves open factual questions as to whether, in negotiating the extension of the Letter of Credit, Rader and/or Thompson hoped to facilitate a scenario in which Colorado Railcar would keep its doors open and pay its employees' salaries effectively at CRM's expense, by accepting interim funding from TriMet that, under the terms of the PMA, would be repaid out of the proceeds of the Letter of Credit. Indeed, although CRM's complaint contains no allegations of fraud against Rader or Thompson, the record does not foreclose the possibility that Rader or Thompson were affirmatively conspiring with TriMet to obtain CRM's consent to the extension of the Letter of Credit by fraud. Under either of these possibilities, there would, at a minimum, be a question of fact as to whether Rader's or Thompson's interests were so adverse to CRM's as to destroy any agency relationship that might otherwise have been in place.

On that basis, I concluded that TriMet had not established as a matter of law that CRM had constructively consented to the PMA.

On reconsideration of the foregoing analyses, I find no reason to disturb my prior ruling that CRM did not consent to the PMA, either actually or constructively.

### c.    Waiver

TriMet argues that I erred in concluding that CRM did not waive its suretyship defenses when, following the date on which Scott State learned of the PMA's existence, it purportedly "facilitated" interest payments to its investors in compensation for serving as Colorado Railcar's surety. TriMet's argument is not well taken, because the interest payments purportedly facilitated by CRM were made by Colorado Railcar pursuant to the investors' agreement to provide security

Page 23 - OPINION AND ORDER

for CRM's repayment obligations to KeyBank in connection with the Letter of Credit – the

enforceability of which was not impacted by discharge of CRM's suretyship obligations – rather

than solely in connection with the parties underlying suretyship arrangement, as TriMet now

suggests.  Because the parties' obligations under the reimbursement agreement were enforceable

independent of the enforceability of CRM's surety obligations, *see* O.R.S. 74.1030(4), TriMet's

argument provides no reason for disturbing my prior ruling that CRM did not waive its

suretyship defenses.

### 4.    CRM's Claim for Common-Law Fraud

CRM's complaint in the lead case of this consolidated action alleges a claim for common-

law fraud.  CRM has now additionally filed a crossclaim for breach of statutory warranty in the

*Guetzko* action, premised on the same allegations of common-law fraud.  TriMet argues that it is

entitled to summary judgment as to each of these claims, asserting that I erred in my previous

disposition of TriMet's argument for summary judgment on the originally filed fraud claim but

also advancing arguments not previously raised before the court.  To the extent TriMet argues

that I erred in my previous disposition, I address its argument in this section.  To the extent

TriMet relies on new arguments, I address its arguments below, in Sections II(B)(2) and II(B)(3)

hereof.

The gravamen of CRM's originally filed fraud claim is that TriMet fraudulently obtained

CRM's consent to the extension of the Letter of Credit from May 15, 2008, to November 15,

2008, thereby causing CRM to suffer damages.  Specifically, CRM argues that TriMet committed

fraud in the course of negotiating the extension by failing to disclose to CRM the existence of the

PMA and by failing to disclose that, by the time those negotiations took place, it had already

obtained Colorado Railcar's stipulation that it was in default under the Contract.  TriMet now

argues, for the first time in these proceedings, that CRM's common-law fraud claim fails as a

matter of law because it does not  meet the standard of "material fraud" required to permit a court

to enjoin a draw on a letter of credit pursuant to O.R.S. 75.1090(1).

TriMet's argument is based on a fundamental conceptual error.  While it may be possible

to infer from CRM's litigation posture that CRM always intended its originally filed common-law

fraud claim to serve as the basis for a statutory breach of warranty claim such as it has now pled

in its fifth crossclaim for relief in the *Guetzko* action, such an inference would not justify

construing the fraud claim as identical to the subsequently filed breach of warranty claim.

Because there is no support in law or in logic for TriMet's position that the material fraud

standard of O.R.S. 75.1090(1) governs the analysis of CRM's originally filed common-law fraud

claim, TriMet's argument provides no reason on reconsideration for disturbing my prior

disposition of TriMet's motion for summary judgment as to CRM's claim for common-law fraud.

### B.    TriMet's Motion for Summary Judgment

In addition to its various assignments of error in connection with my previous

dispositions in this consolidated action, TriMet argues that it is entitled to summary judgment as

to CRM's remaining claims for declaratory relief and for common-law fraud and crossclaims for

unjust enrichment, for money had and received, for breach of contract, and for breach of statutory

warranty.

### 1.    CRM's Claims for Declaratory Relief and the *Guetzko* Plaintiffs' Claims for Declaratory Relief

By and through its complaint in the lead case in this consolidated action, CRM requests

this court's declaratory judgment that the Letter of Credit is unenforceable and expired, that

Page 25 - OPINION AND ORDER

TriMet has no recourse against the Letter of Credit, and that TriMet's draw request dated October 22, 2008, and any further draw requests, are without effect. Similarly, the plaintiffs in the *Guetzko* action request this court's declaratory judgment that the Letter of Credit is unenforceable and expired, that TriMet's draw request dated October 22, 2008, and any further draw requests, are without effect, and that honor of TriMet's draw request would facilitate "a major material fraud" by TriMet on CRM.

TriMet argues that, in light of the fact that TriMet's draw request has been honored and in light of this court's findings that TriMet was entitled to draw on the Letter of Credit pending resolution of the parties' dispute in connection with the contractual arrangements underlying the Letter of Credit, the foregoing requests for declaratory judgment should be denied as moot. CRM concedes that TriMet is correct, and the *Guetzko* plaintiffs offer no opposition to TriMet's motion for summary judgment on their declaratory judgment claim. I agree with TriMet that the claims for declaratory relief are moot in light of TriMet's successful draw and my prior holdings. TriMet's motion is therefore granted as to CRM's claim for declaratory judgment and as to the *Guetzko* plaintiffs' claim for declaratory judgment.

### 2.    CRM's Claim for Common-Law Fraud

In addition to its arguments that I erred in failing to analyze CRM's claim for common-law fraud as though it were governed by the standards discussed in O.R.S. 75.1090(1), discussed above, TriMet argues that it is entitled to summary judgment on the common-law fraud claim because CRM has failed to come forward with evidence that it was damaged by TriMet's alleged fraud. In response, CRM suggests that its unfiled consent judgment in KeyBank's favor could constitute damages in connection with its claim for common-law fraud.

Page 26 - OPINION AND ORDER

Here it is CRM that commits conceptual error.  The evidentiary record does not support the proposition that CRM's damages in connection with its common-law fraud claim could be co-extensive with the amount it is required to pay KeyBank in reimbursement for its payment to TriMet on the Letter of Credit.  Instead, it is clear that CRM's damages in connection with its fraud claim can only be the amount, if any, by which CRM was allegedly left worse off following the extension of the Letter of Credit's deadline than it would have been had the deadline not been extended, *i.e.*, the amount by which, absent the extension, TriMet's draw would have been less than the maximum allowable amount, and/or the amount by which the extension caused Colorado Railcar to have fewer assets available with which to reimburse CRM for its costs in covering TriMet's draw than it would have had if the draw had occurred on or around May 15, 2008.  The fact that CRM may at some future date stipulate that it is liable to KeyBank in the amount of TriMet's draw plus interest and costs, without more, is insufficient to satisfy the damages element of CRM's fraud claim.

TriMet's motion squarely raises the issue of damages, and TriMet has come forward with evidence that absent extension of the Letter of Credit, TriMet would have made a maximum draw on the letter on or around its date of expiration.  TriMet argues, in addition, that CRM was in fact no worse off following the extension than it would have been absent the extension, because Colorado Railcar would not have had assets available with which to reimburse CRM no matter when TriMet's draw occurred.  It is therefore CRM's burden to come forward with evidence sufficient to create a question of fact as to whether CRM suffered damages proximately caused by TriMet's alleged fraud.  CRM has not met its burden.

Because CRM has failed to produce evidence from which a trier of fact could reasonably

Page 27 - OPINION AND ORDER

conclude that it was damaged by TriMet's alleged fraud, TriMet's motion for summary judgment

is granted as to CRM's common-law fraud claim.

>   **3.    CRM's Crossclaim for Breach of Statutory Warranty Premised on Material Fraud by the Beneficiary**

Under Oregon law, TriMet, by successfully presenting KeyBank with its request to draw

on the Letter of Credit, warranted to both KeyBank and CRM that its draw request would not

facilitate material fraud on either KeyBank or CRM.  *See* O.R.S. 75.1100(1)(a); *see also* O.R.S.

75.1090(1).

As noted above, CRM brings a crossclaim against CRM for breach of the statutory

warranty that its draw request did not facilitate material fraud on CRM or on KeyBank.  TriMet

argues that the statutory warranty claim fails as a matter of law because CRM's allegations of

fraud do not satisfy the requirement that TriMet's alleged fraud have been "material" as that term

is used in O.R.S. 75.1090(1) and O.R.S. 75.1100(1)(a).[5]

Oregon law does not expressly define the term "material" in this context.  However,

O.R.S. 75.1090(1) is a codification of Uniform Commercial Code § 5-109, comment 1 to which

provides, in relevant part, as follows:

>   This recodification makes clear that fraud must be found either in the documents
>   or must have been committed by the beneficiary on the issuer or applicant.  . . .
>
>   Secondly, it makes clear that fraud must be "material."  . . .  The use of the word
>   requires that the fraudulent aspect of a document be material to a purchaser of that
>   document or that the fraudulent act be significant to the participants in the

---

[5]  This issue was potentially raised previously in this action, in the context of TriMet's
renewed motion (09-1135: #49) to dissolve the injunction enjoining it from seeking to draw on
the Letter of Credit, but I did not address it at that time because I was able to resolve the motion
in TriMet's favor on the ground that the *Guetzko* plaintiffs were unable to establish that they were
more likely than not to prevail on their fraud claim.

underlying transaction. . . .

Material fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor. The section indorses articulations such as those stated in *Intraworld Indus. v. Girard Trust Bank*, 336 A.2d 316 (Pa. 1975), *Roman Ceramics Corp. v. People's Nat. Bank*, 714 F.2d 1207 (3d Cir. 1983), and similar decisions and embraces certain decisions under Section 5-114 that relied upon the phrase "fraud in the transaction." Some of these decisions have been summarized as follows in *Ground Air Transfer v. Westate's Airlines*, 899 F.2d 1269, 1272-73 (1st Cir. 1990):

> We have said throughout that courts may not "*normally*" issue an injunction because of an important exception to the general "no injunction" rule. The exception, as we also explained in *Itek* [*Corp. v. First Nat'l Bank*], 730 F.2d [19,] 24-25 [(1st. Cir. 1984)], concerns "fraud" so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances "plainly" show that the underlying contract forbids the beneficiary to call a letter of credit, *Itek*, 730 F.2d at 24; where they show that the contract deprives the beneficiary of even a "colorable" right to do so, *id.*, at 25; where the contract and circumstances reveal that the beneficiary's demand for payment has "absolutely no basis in fact," *id.*; *see Dynamics Corp. of America*, 356 F. Supp. at 999; where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served," *Itek*, 730 F.2d at 25 (*quoting Roman Ceramics Corp. v. Peoples National Bank*, 714 F.2d 1207, 1212 n.12, 1215 (3d Cir. 1983) (*quoting Intraworld Indus.*, 336 A.2d at 324-25)); then a court may enjoin payment.

U.C.C. § 5-109, cmt 1 (emphasis original). Oregon law provides no reason to doubt that the

Oregon courts would interpret Oregon's codification of the Uniform Commercial Code in a

manner consistent with generally accepted interpretations of the uniform code provisions

themselves.

I agree with TriMet that CRM's allegations of fraud do not satisfy the materiality

requirement of O.R.S. 75.1090(1) and O.R.S. 75.1100(1)(a). At most, TriMet's conduct in

allegedly fraudulently obtaining CRM's consent to the extension of the deadline modified the

Page 29 - OPINION AND ORDER

timeframe within which TriMet had a right to draw, and had no impact on the question whether

TriMet could properly draw on the letter during its effective period.  Viewing TriMet's alleged

conduct in the light most favorable to CRM, it is therefore clear that the circumstances of the

alleged fraud could not have so vitiated the transaction that the legitimate purposes for which the

irrevocable letter of credit first issued would not be served by honoring TriMet's draw.  Under the

definition of material supplied in the Uniform Commercial Code, or indeed under any other

reasonable definition of the term, TriMet's alleged fraud cannot have been "material" for

purposes of O.R.S. 75.1090(1) and O.R.S. 75.1100(1)(a).  TriMet's motion is therefore granted as

to CRM's fifth crossclaim for relief in the *Guetzko* action, alleging breach of the statutory

warranty arising under O.R.S. 75.1100(1)(a).

> **4.     CRM's Crossclaim for Breach of Statutory Warranty Premised on Violation of Underlying Agreements**

Under Oregon law, TriMet, by successfully presenting KeyBank with its request to draw

on the Letter of Credit, additionally warranted to CRM that its draw request did not violate any

agreement intended to be "augmented" by the Letter of Credit.  O.R.S. 75.1100(1)(b).  As noted

above, I have already had occasion in this consolidated action to conclude that CRM's obligations

as surety of Colorado Railcar's obligations under the Contract were discharged when TriMet and

Colorado Railcar entered into the PMA, and I have affirmed that conclusion on reconsideration

herein.  In consequence, TriMet is necessarily in breach of the Section 75.1100(1)(b) warranty as

a matter of law, in that the Letter of Credit was the mechanism by which the parties intended

TriMet's recourse against CRM as secondary obligor of Colorado Railcar's contractual

obligations to be effected.

TriMet does not dispute that, on the assumption that CRM's suretyship obligations had

previously been discharged, its successful draw on the Letter of Credit necessarily put it in breach of the Section 75.1100(1)(b) warranty.  Instead, in support of its position that it is entitled as a matter of law to summary judgment as to CRM's statutory warranty crossclaim TriMet asserts – without citation to supporting authority – that damages are an essential element of a claim for breach of statutory warranty, and argues only that the crossclaim necessarily fails because CRM is unable to satisfy the damages element.  However, nothing in Section 75.1100(1)(b) or elsewhere in Oregon's codification of the Uniform Commercial Code suggests that damages are an essential element of a breach of statutory warranty action (although it is clear that consequential damages are available as a remedy in such actions), and Oregon case law strongly suggests, to the contrary, that nominal damages may be awarded in breach of warranty actions where actual damages are absent.  *See*, *e.g.*, *Schafer v. Fraser*, 206 Or. 446, 486-487 (1955). TriMet's motion is therefore denied as to CRM's fourth crossclaim for relief in the *Guetzko* action, alleging breach of the statutory warranty arising under O.R.S. 75.1100(1)(b).

### 5.    CRM's Remaining Crossclaims For Money Damages

CRM's remaining crossclaims are for unjust enrichment, for money had and received, and for breach of contract.  As to each of these crossclaims, CRM seeks money damages in the amount of CRM's liability to KeyBank in connection with KeyBank's counterclaim against it. TriMet asserts, correctly, that cognizable damages constitute an essential element of each of these crossclaims.  *See*, *e.g.*, *Edward D. Jones & Co. v. Mishler*, 161 Or. App. 544, 569 (1999) (damages essential element of claim for unjust enrichment); *Comcast of Ore. II, Inc. v. City of Eugene*, 346 Or. 238, 254 (2009) (damages essential element of claim for money had and received); *Moini v. Hewes*, 93 Or. App. 598, 602-603 (Or. Ct. App. 1988) (damages essential

element of claim for breach of contract).  As it does in connection with CRM's crossclaim for breach of the statutory warranty arising under Section 75.1100(1)(b), discussed above, TriMet argues that each of these crossclaims necessarily fails because CRM is unable to satisfy the damages element of each claim.

In response, CRM offers two arguments.  First, CRM argues that its as-yet unfiled consent judgment in KeyBank's favor satisfies the damages requirement of its crossclaims. Assuming without deciding that an unconditional consent judgment can constitute cognizable damages, that consent judgment has not yet been filed, and therefore cannot at this time satisfy CRM's damages requirements.  Instead, as TriMet asserts, the evidentiary record establishes that CRM has not yet suffered any actual damages in connection with TriMet's draw on the Letter of Credit.

Second, CRM argues that its need to show current actual damages is obviated by operation of Federal Civil Procedure Rule 13(g), which provides as follows:

> A pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action.  The crossclaim may include a claim that the coparty is or may be liable to the crossclaimant for all or part of a claim asserted in the action against the crossclaimant.

Rule 13(g) governs whether claims may be pled as crossclaims in a pending action or must instead be pled as independent claims in a new action, *see*, *e.g.*, *Soto v. Greyhound Lines, Inc.*, Case No. 06-01612-MCE-DAD, 2008 U.S. Dist. LEXIS 92173 (D. Cal. October 27, 2008), *citing Donovan v. Robbins*, 588 F. Supp. 1268 (N.D. Ill. 1984), and has been interpreted as permitting claims for indemnity against codefendannts that are contingent on the outcome of claims brought against the party claiming a right to indemnity*, see*, *e.g.*, *Holmes v. MTD Prods.*, Case No.

Page 32 - OPINION AND ORDER

06-1527-SMS2009, U.S. Dist. LEXIS 39225 (D. Cal. April 27, 2009), *citing Atlantic Aviation Corp. v. Estate of Costas*, 332 F. Supp. 1002, 1006-07 (D.C.N.Y. 1971).  No court has interpreted Rule 13(g) as obviating the need to establish the essential element of damages as to crossclaims other than crossclaims for indemnity, nor does the plain language of the rule support any such interpretation.  Although CRM's liability to KeyBank on KeyBank's counterclaim for breach of contract would constitute damages for purposes of CRM's crossclaims against TriMet, the crossclaims are not premised on a theory of indemnity and cannot properly be construed as indemnity claims.

Because Rule 13(g) does not satisfy the damages element of CRM's crossclaims, TriMet's argument is well taken, and I need not address its alternative argument that CRM may not prevail on both its unjust enrichment crossclaim and its breach of contract crossclaim, and that therefore at least one of those claims must fail as a matter of law.  TriMet's motion is granted as to CRM's crossclaims for unjust enrichment, money had and received, and breach of contract.  Dismissal of these crossclaims on this ground shall not prejudice CRM's right to refile its crossclaims in the event CRM suffers actual damages at some later date.

### III.    CRM's Motion for Summary Judgment

CRM argues that it is entitled to summary judgment as to each of its five crossclaims for relief against TriMet.  As discussed above, TriMet's motion for summary judgment is well taken as to CRM's fifth crossclaim, alleging TriMet's liability for breach of the statutory warranty arising under O.R.S. 75.1100(1)(a), and first through third crossclaims, alleging TriMet's liability for unjust enrichment, money had and received, and breach of contract.  CRM's motion is therefore denied as to each of these four crossclaims.

Page 33 - OPINION AND ORDER

By contrast, damages are not an element of CRM's fourth crossclaim, which alleges TriMet's breach of the statutory warranty arising under O.R.S. 75.1100(1)(b).  Moreover, also as discussed above, a direct and necessary consequence of my conclusion that CRM's obligations as surety of Colorado Railcar's obligations under the Contract were discharged when TriMet and Colorado Railcar entered into the PMA is that TriMet is in breach of the Section 75.1100(1)(b) warranty as a matter of law, because the Letter of Credit was intended to augment the parties' agreement that CRM was to serve as secondary obligor of Colorado Railcar's contractual obligations to TriMet.  CRM is therefore entitled to partial summary judgment in connection with its Section 75.1100(1)(b) crossclaim, as to TriMet's liability only, leaving open the question of damages.  CRM's motion is therefore granted as to TriMet's liability only on CRM's fourth crossclaim for relief, and is otherwise denied.

## CONCLUSION

For the reasons set forth above, KeyBank's motion (#110) is denied, TriMet's motion (#115) is granted as to CRM's claim for declaratory judgment, granted as to the *Guetzko* plaintiffs' claim for declaratory judgment, granted as to CRM's claim for common-law fraud, granted as to CRM's crossclaims for unjust enrichment, money had and received, breach of contract, and breach of the statutory warranty arising under O.R.S. 75.1100(1)(a), and otherwise denied, and CRM's motion (#118) is granted as to the narrow question of TriMet's liability in

/ / /

/ / /

/ / /

/ / /

Page 34 - OPINION AND ORDER

connection with CRM's crossclaim for breach of the statutory warranty arising under O.R.S.

75.1100(1)(b) and otherwise denied.

Dated this 26th day of May, 2010.

 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge